UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X
                            :
HEINS RODRIGUEZ,            :
                            :    16-CV-5861 (NG)(RER)
             Plaintiff,     :
                            :    April 24, 2018
                            :
          V.                :    Brooklyn, New York
                            :
CITY OF NEW YORK, et al.,   :
                            :
             Defendant.     :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION CONFERENCE
BEFORE THE HONORABLE RAMON E. REYES, JR
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          GABRIEL HARVIS, ESQ.
                            BAREE FETT, ESQ.


For the Defendant:          ZACHARY BERGMAN, ESQ.
                            ARTHUR LARKIN, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1           THE CLERK:  Civil cause for motion hearing,

2  docket number 16-CV-5861, Rodriguez v. City of New

3  York.

4           Counsel for plaintiff, please state your

5  name for the record.

6           MR. HARVIS:  Gabriel Harvis of Harvis & Fett

7  for the plaintiff Heins Rodriguez.  Good morning, your

8  Honor.

9           MS. FETT:  Good morning, your Honor.  Baree

10  Fett for plaintiff Heins Rodriguez.

11           THE COURT:  Good morning.

12           THE CLERK:  Counsel for the defendants,

13  pleas state your name for the record.

14           Mr. BERGMAN:  Good morning, your Honor.

15  Zachary Bergman for the City and the individually named

16  defendants.

17           MR. LARKIN:  Good morning, your Honor.

18  Arthur Larkin, City Law Department, also for the

19  defendants.

20           THE COURT:  Good morning.

21           Mr. Harvis, this is your application, so go

22  ahead.

23           MR. HARVIS:  Thank you, your Honor.  Our

24  position is that -- everything is in our letter.  We

25  had requested material back in March of 2017.  We

consider the material to be core discovery, much of
which is subject to mandatory disclosure pursuant to
Rule 26(a).  The City has no legitimate objection to
the production and they haven't even articulated a
position in opposition on the merits.  They've simply
taken the position that plaintiff has violated an
imaginary order limiting his ability to get discovery
and that the's failed to show good cause.  We don't
believe that that argument has any basis in law and we
believe that the defendants should be compelled to
produce the material.  We don't think this is a very
controversial application.

THE COURT:  Why didn't you raise this issue
prior to April 11th?

MR. HARVIS:  Well, we were working with the
defendants over the course of approximately nine months
to try to get the material.  We had served a number of
emails to them.  We attached them as exhibits to our
motion.  We repeatedly informed Ms. Bardauskis that we
were going to be seeking court intervention and she
asked us not to, told us that she would be producing
things.  Then it finally got to a point where we
believed it was responsible to involve the Court
because we had not received core documents and they
were needed in order to take depositions.  We were also

1   well within the discovery deadline when we did that.

2           But in terms of why it wasn't specifically

3   raised at the last conference?

4           THE COURT:  Yeah.  Well, that's part of it.

5           MR. HARVIS:  There was no -- to be fair, I

6   don't believe that there was any question posed to

7   counsel about if there were open disputes.  Defense

8   counsel certainly knew that we had raised these matters

9   by email and that there were open issues.  My reading

10  of the transcript was that the Court basically said we

11  had until May 18th to get the case ready.

12          THE COURT:  There's a colloquy with Ms. Fett

13  right at the front of the conference, when I say,

14  "Okay, you're done with discovery, right?"  Then Ms.

15  Fett says, "No, we're not, we're close," and then she

16  talks about -- all she talks about is depositions.

17  There was no discussion of outstanding documents.

18          MR. HARVIS:  Sure, I appreciate that.  I can

19  speak to that, your Honor, unless you -- would you like

20  to?

21          MS. FETT:  You can go ahead.

22          MR. HARVIS:  I was just going to say that

23  the defendants are the defendants are the ones who were

24  aware of the fact that this material was overdue.

25  We're acting I think squarely within the rules by first

serving a Rule 33 and 34 demand, following up by email,

and in good faith attempting to obtain them directly

from the City.  And then only when it became impossible

to complete the case without the material did we give

them a final opportunity to produce it.  They still

refused to provide a date certain when they would

provide it.  As we mentioned, this is stuff that is

subject to mandatory disclosure in large measure.  So

then we, well within the deadline, filed the motion.

So in terms of why --

THE COURT:  Well within an extended

deadline, when the discussion was held prior to the

original deadline, either prior to or right after the

original deadline expiring.

MR. HARVIS:  We concede that but I think the

Court knows, the main reason why these deadlines have

been adjusted are reasons that are completely outside

of the control of the plaintiff.  Plaintiff at every

turn has been nothing but accommodating with a series

of courtesies when these events have befallen the

defense attorneys.  For us to then be told that that

somehow acts to limit our ability to pursue relevant

discovery seems frankly unfair because all we know is,

this is a discovery deadline.  You have to serve your

demands more than thirty days before that deadline.  If

1 you're going to move for something, you'd sure better

2 do it before the deadline expires.

3 Here we had -- first, we told them about it

4 on April 4th, when there was like six weeks left.  They

5 didn't even get back to us for a week.  Then when we

6 finally met, they said they don't dispute that we're

7 entitled to it but they can't give us a date, so we

8 wrote the Court.  I don't see anywhere in the

9 transcript where your Honor said we couldn't pursue

10 discovery or there was any limitation on what we could

11 pursue.  Since what we're talking about is such

12 squarely relevant material, we just didn't understand

13 there to be any limitation at all on our pursuit of

14 that material.

15 If I may, your Honor, I have one more thing

16 I'd like to add.

17 THE COURT:  Hold on just one second.

18 MR. HARVIS:  Of course.

19 (Pause in proceedings.)

20 THE COURT:  All right.

21 MR. HARVIS:  I do think it makes sense to

22 talk about orders and whether or not orders in this

23 case have been obeyed, because the orders that were

24 actually made at that March 22nd conference, and we

25 quoted that portion, were that the defendants, given

the prior proceedings, needed to expeditiously make sure that this case was properly transferred. As we know, and there's just no question about it, that did not happen.

What happened was, it was initially transferred to someone who was unprepared to deal with the litigation, which has not been expanded in the least, so that was a violation of the Court's order. Then a second violation happened when the Court ordered the parties to meet and confer in good faith on Friday, and that process was frustrated by the fact that a new attorney was assigned yesterday and that person obviously knew nothing about the case and again could not meaningfully participate in the meet and confer because they didn't know the file and they just simply stated over and over as we tried to go through the issues that they stood on their objections, even though for example, with respect to the disciplinary files, their objections would have not only no basis in law, but they're directly contrary to your Honor's own ruling in the <u>Frails</u> case, which is on all fours with the facts here.

It's an egregious excessive force incident. We're seeking the files that are relevant to that kind of a case. We don't find it controversial. So we

1  believe that the issue of violating court orders is

2  really on one side of the table.

3       THE COURT:  Even if I were to agree with you

4  that there is some document discovery that, although it

5  wasn't specifically discussed at the March 22nd

6  conference, remains outstanding because in the letter

7  asking for an extension, a joint letter asking for an

8  extension, you referred to -- or Ms. Fett it was I

9  guess who wrote the letter.  The parties require

10  additional time to conduct depositions and to complete

11  any remaining document discovery.  So I agree with you

12  there.  You've asked for additional depositions of

13  nonparties that were not discussed either at the

14  conference or previously.

15       MR. HARVIS:  I appreciate that, your Honor,

16  and I would say -- first of all, I just want to -- I

17  don't mean to disagree with the Court at all but I

18  would say that we haven't asked for them because I

19  don't believe that we need to ask for them, because I

20  believe that under the rules, we are presumptively

21  entitled to take ten depositions.  We haven't even

22  suggested the taking of ten depositions.  We've

23  suggested less.  Our application that was presented to

24  your Honor on April 11th does not seek leave of the

25  Court to take depositions because no order was entered

1  limiting our ability to take depositions.  With the

2  benefit of hindsight, of course I would have liked to

3  have been able to say to the Court at the last

4  conference, there are three other people that we may

5  also want to depose, three or four, but I believe that

6  it's not only --

7       THE COURT:  I thought it was eight.

8       MR. HARVIS:  Well, the total is eight but we

9  mentioned four at the last conference, so it's an

10  additional four.  But I would submit to your Honor that

11  when an attorney is handling a case and the discovery

12  period remains open, and there's been no order cabining

13  the parties' ability to take discovery, that

14  professional responsibility demands --

15       THE COURT:  Well, there was an order

16  cabining the time period in which to do it.

17       MR. HARVIS:  Of course.  So long as we -- if

18  we were unable to meet that deadline, then we have a

19  problem and we have to seek leave.  But that's why, in

20  a responsible manner, more than six weeks out from the

21  expiration of the deadline, we made, in the most

22  detailed manner possession, the outstanding material

23  known to the defendants.  We gave them a reasonable --

24       THE COURT:  Wait a second, wait a second.  I

25  extended the discovery on March 22nd.

1           MR. HARVIS:  Yes.

2           THE COURT:  At that point, there were

3    depositions that the parties had discussed taking that

4    were still outstanding.

5           MR. HARVIS:  Yes.

6           THE COURT:  There were documents -- any

7    remaining document discovery that was asked for was

8    promised, just not by a date certain.  At that point, I

9    extended it.  I didn't know about these other

10   depositions that you wanted to take.

11          MR. HARVIS:  Right.

12          THE COURT:  So then you noticed them after

13   the fact, when the order itself -- I'll put up the

14   transcript if I have it -- while not artfully phrased

15   -- where is it?

16          MR. BERGMAN:  Page 9, your Honor.

17          THE COURT:  Thank you.

18          MR. BERGMAN:  Top of page 9.

19          THE COURT:  Thank you.  "I will give you

20   until May 18th to complete all discovery, depositions,

21   post-deposition document requests, whatever."  I guess

22   whatever is the catchall but it was never -- even if

23   whatever were to include any remaining document

24   discovery which was mentioned in the joint letter

25   asking for an extension and even if whatever would

1  include -- whatever doesn't include depositions.

2  Depositions must specifically reference but the only

3  depositions that I was told about were the ones that we

4  discussed of the officers, the defendants and the

5  plaintiff, not these other ones.

6          MR. HARVIS:  I'm glad your Honor brought

7  that up because I think that goes to sort of some other

8  issues that we raised in our letter that we filed last

9  night, which is, we've been doing our best to navigate

10  a shifting landscape on the defendants' side of the

11  case, one attorney to the next, everyone has to get up

12  to speed, representations are made, disclosures are

13  made, nobody knows what's going on.  We have the fifth

14  and sixth attorney here now.  I referenced in our third

15  footnote of the letter we filed last night --

16          THE COURT:  Is Mr. Larkin the sixth you're

17  referring to?

18          MR. HARVIS:  Yes.

19          THE COURT:  He's only for the day, I'm sure.

20          MR. HARVIS:  Okay, I won't count him.

21          THE COURT:  You won't see him again.

22          MR. HARVIS:  Fifth attorney.  What I would

23  say is, we were given, and I gave the Court this as an

24  exhibit, the sergeant's memo book with a redaction that

25  prevented us from learning that there was another

1  officer that was actually at the scene that day.  We

2  didn't know that.  That wasn't part of the Rule 26

3  disclosures.  It was never disclosed to this day.  What

4  we did was, we were able to --

5          THE COURT:  When were you given that?

6          MR. HARVIS:  That was part of the, I

7  believe --

8          MS. FETT:  The memo book?

9          MR. HARVIS:  Yeah.  Do you know?

10          MS. FETT:  We were first given it in a very,

11  very redacted form, I want to say in maybe March of

12  this year.

13          MR. HARVIS:  So we then --

14          THE COURT:  So that was prior to the March

15  22nd conference.

16          MS. FETT:  I think so.

17          MR. HARVIS:  We don't dispute, your Honor,

18  that at the March 22nd conference, we hadn't done -- we

19  hadn't looked at the file closely enough to identify

20  every deposition that needed to be taken.  We had not

21  done that at that point.  In fairness, though, we don't

22  believe that there was any kind of -- there's a Federal

23  Rule or any order from the Court that would have

24  required us to do it by that date, when the discovery

25  period, so much of it remained.

1          THE COURT:  I don't understand why you say

2    so much of it had remained because discovery was set to

3    close on March 19th.

4          MR. HARVIS:  The reason I say that is

5    because the only reason that discovery was set to close

6    at that date and so little had happened is because of

7    the series of delays from the defendants.  So my view

8    is, we were never given --

9          THE COURT:  Wait, discovery was not set to

10   close on that date because of the problems that the

11   defendants were creating.  It was set to close because

12   that was the case management plan.  We set it, we set

13   the close of discovery like I do in ever case, and

14   discovery closed.  You asked for an extension for the

15   very limited purpose of conducting the officer

16   depositions and the plaintiff and completing any

17   remaining document discovery.  You knew about the

18   existence of this other officer.

19          MR. HARVIS:  We did not.

20          THE COURT:  Ms. Fett said that you had the

21   memo book sometime in March.

22          MR. HARVIS:  Improperly redacted, so that

23   this officer's name was withheld.  That was the state

24   of it at that time.

25          MR. BERGMAN:  Your Honor, if I may.

1          THE COURT:  Not yet.

2          MR. HARVIS:  So my point is, your Honor,

3   that in fact, we didn't have anything because by giving

4   us a memo book where the name is redacted, we're not

5   provided with the information.  So we're thankful that

6   that extension was granted providently by your Honor.

7          THE COURT:  So you got a memo book with the

8   name of the officer redacted.

9          MR. HARVIS:  And then --

10          THE COURT:  Is it what appears in --

11          MR. HARVIS:  No, it's not, unfortunately.

12   Here, I can hand it up to your Honor.

13          THE COURT:  I've seen it.

14          MR. HARVIS:  Yeah, last night.

15          THE COURT:  It was in your letter last

16   night.

17          MR. HARVIS:  Yeah.  So you see how it only

18   gives that first line of the August 13th tour and then

19   it's a big block of redactions.  Right below that line,

20   it says who his driver is.

21          THE COURT:  Exhibit 1 or 2?

22          MR. HARVIS:  It's Exhibit 2, Def-723.

23          THE COURT:  Okay.

24          MR. HARVIS:  Right below -- in that black

25   box right below the first entry for August 13th, it

1  lists the sergeant's driver.  I forget but I think it's

2  like Sanchez.  I don't remember off the top of my head

3  what his name is.  Basically, we're given this raw

4  footage without the software to view it.  I finally

5  track it down and I get my Mac to use the PC software

6  to watch this video, and we're able to see the video,

7  the part we've never seen before, after he's on the

8  ground and when the sergeant and his driver arrive, and

9  we see them both get out of the car.

10            If you read our April 4th email that was an

11  exhibit to our letter, one of the first things we say

12  is, what is going on with you not disclosing this

13  officer?

14            THE COURT:  Wait a second.  The first car

15  with the two defendants --

16            MR. HARVIS:  Hits him or whatever.

17            THE COURT:  Or whatever.  Then another car

18  comes on the scene.

19            MR. HARVIS:  The sergeant then verifies the

20  arrest.  That's when this backpack search happens and

21  that's also caught on video.  When you see the officers

22  in their text messages trying to tell the ADA that it

23  happened at the precinct, in the video, it actually

24  shows them searching at the scene.  That's just as an

25  aside.  So now we have that evidence and we go back to

1  them responsibly and say, who is this person thirteen

2  months into the litigation that you haven't disclosed?

3          THE COURT:  So the sergeant and his driver

4  are relevant in what way?

5          MR. HARVIS:  Well, they're fact witnesses to

6  his treatment.  Instead of calling an ambulance for

7  him, they take him to the precinct.  The sergeant and

8  the driver as a witness saw the sergeant agreeing that

9  that should happen.  Someone who has just been in a car

10 accident without a helmet should be taken to the

11 precinct instead of the hospital.  Then they're also a

12 witness to a medical treatment call not being made

13 until 6:08 p.m., a call I might add that has never

14 produced to us, even though those calls to IAB command

15 center are recorded.  That's one of the things in

16 category one of our letter.

17         So my position is, there have been

18 inadequate disclosures by the defendants in addition to

19 these life events, and then a series of demonstrable

20 violations of the Court's orders on that side of the

21 table.  All we've tried to do is navigate that

22 situation as best we can with candor, without violating

23 a single order.  In terms of these depositions, which

24 is not part of our April 11th application at all, I

25 would just say these are brief depositions of people

1  who are clearly relevant witnesses.

2          THE COURT:  Who?

3          MR. HARVIS:  The ADA -- actually, I should

4  step back for a second.  There's one other thing I want

5  to mention.  It's not the only issue with the memo

6  book.  When the arresting officer's memo book was first

7  produced to us, only his tour for August 13th was

8  produced, not his tour for August 14th.

9          By happenstance again, we later in discovery

10  got an unredacted version of the arresting officer's

11  memo book that showed that that August 14th event was

12  hugely relevant because it showed a 53-minute call with

13  the ADA, 53 minutes of conversation between the officer

14  and the ADA on the day following this event.  Not only

15  was that improperly redacted in the first instance but

16  that clearly makes the ADA that that officer spoke to

17  an appropriate witness for a brief deposition.  What

18  did the officer tell you, what was the conversation

19  like, what evidence did you learn and so forth?  I

20  don't think that's controversial at all.

21          So for us to be making this about

22  depositions that are not a subject of the application

23  and are relevant and brief just strikes me as

24  unnecessary, when the actual documents at issue are so

25  basic and there's no real objection to producing them.

1          THE COURT:  So who is it that you want to

2    depose?

3          MR. HARVIS:  We want to depose the ADA who

4    had the call with the officer, the ADA who then went on

5    to prosecute the case, who we think also prepared --

6    we're in the process of getting the transcripts from

7    the criminal proceeding.  We believe that there were

8    actually hearings in this case that the officers were

9    prepped for, where they talked about the backpack and

10   everything else, so those two ADA's.  And then the

11   people who went to the hospital that night and took the

12   photographs that have never been produced to us and did

13   interviews that have never been produced to us.  We

14   just want to know --

15         THE COURT:  The people who went to the

16   hospital that night, what do you mean by the people?

17         MR. HARVIS:  So IAB and I believe it's

18   Queens North sent investigators to the hospital.  You

19   know how they do that after someone is hurt and they

20   say -- they interview them immediately without counsel

21   and it's recorded and they take photographs.  So the

22   people who did those interviews were never disclosed as

23   witnesses with knowledge but we determined who they

24   were by documents.  Those people took photographs of

25   plaintiff's injuries that have never been produced to

us, even though they're mentioned in all the documents.
We've been talking about this all over.  So we want to
depose the people who took the photographs, once we get
the photographs, and the people who did the interviews,
once we get the interviews.  Those depositions will not
be long.

THE COURT:  And you know there are two
people?

MR. HARVIS:  We know -- yeah.  There's one
person who took photographs and interviewed the
sergeant and then there's one other person who took
photographs.  The City never disclosed them as
witnesses but we have their names.

THE COURT:  So that's two ADA's, someone
from IAB, someone from Queens North?

MR. HARVIS:  Yes.

THE COURT:  And what else?

MR. HARVIS:  I think that's it.  I have to
look back at the email.

THE COURT:  In addition to the --

MR. HARVIS:  The parties.

THE COURT:  The parties.

MR. HARVIS:  And this new officer who was
never disclosed.

MR. BERGMAN:  Your Honor, on page I believe

1  10 -- sorry, the tenth exhibit to plaintiff's motion,

2  there's a list of eight categories of individuals that

3  are purported to be --

4              THE COURT:  Exhibit 2 to plaintiff's letter?

5              MR. BERGMAN:  Exhibit 10, sorry, your Honor.

6  It's page 6 of 20.

7              THE COURT:  It's an email to Ms. Bardauskis.

8              MR. BERGMAN:  Yes.  There are three

9  defendants, your Honor, so it's not just an additional

10 four depositions that are being discussed.

11             MR. HARVIS:  That's fair, I apologize.  I

12 hadn't reviewed this --

13             THE COURT:  Well, the defendants were

14 discussed at the March 22nd conference.

15             MR. BERGMAN:  Yes, your Honor.

16             THE COURT:  So they're not additional

17 depositions.  Those are depositions that were --

18             MR. HARVIS:  These are all individuals, your

19 Honor, who were there that night and participated in

20 the investigation.  I have to say, not only -- we have

21 no intention of including these people as defendants,

22 although that officer on the scene is a separate issue.

23 But I'm more talking about, in one day, we could do all

24 these depositions.  This is not meant to expand the

25 scope.  We just want to cross our t's so that when we

1  go to trial, if they have relevant testimony, we can

2  call them.

3        THE COURT:  I see Exhibit 10.

4        MR. HARVIS:  It says, depositions to be

5  scheduled and there are eight people listed or eight

6  categories, the defendants --

7        THE COURT:  Hold on.

8        MR. HARVIS:  Take your time.

9        THE COURT:  What page?

10        MR. HARVIS:  It's page 6 of 20, your Honor.

11  This is the City's responsive email but it doesn't

12  matter.

13        THE COURT:  Sergeant Cancellino (ph)?

14        MR. HARVIS:  Can I tell you who these people

15  are?

16        THE COURT:  Yes.

17        MR. HARVIS:  Sergeant Cancellino was the

18  desk sergeant who called in plaintiff's injury, whose

19  phone call to IAB we haven't been provided with.  So

20  he's a desk sergeant and he's also, by the way, the

21  person who marks plaintiff down as apparently normal

22  when he's brought to the precinct.  Physical condition

23  apparently normal, when he's brought to the precinct

24  after this car accident, so we think he might have

25  relevant information.

1         Sergeant Megan (ph) -- and that's the same

2 person.  It's spelled differently in the documents.

3 That's one of the investigators that went to the

4 hospital and took photographs.  So did Captain Forgione

5 (ph).  Sergeant Shaffadia (ph) was the overnight desk

6 sergeant at the precinct, who had communications with

7 Central Brooking about plaintiff's medical condition.

8 That's going to be like a five-minute deposition.  Then

9 Dibonay (ph) is one of the escort officers listed on

10 the medical treatment --

11         THE COURT:  One of the who?

12         MR. HARVIS:  The escort officers that was

13 with --

14         THE COURT:  Escort, okay.

15         MR. HARVIS:  -- plaintiff at the hospital.

16 We think that's relevant because there's obviously a

17 dispute about the extent of plaintiff's injuries and

18 what was said between him and medical staff.  Then

19 Kivlin (ph) is also someone who was investigating at

20 the hospital.  Those are all people who have direct

21 knowledge from the day of the incident, who I know were

22 never disclosed by the City as witnesses with knowledge

23 at all.

24         MS. FETT:  Your Honor, just to be fair --

25         MR. HARVIS:  Except Cancellino.

1          MS. FETT:  -- I think in defendants'

2    discrimination responses, they did identify Cancellino

3    and I think possibly Forgione.

4          THE COURT:  In their --

5          MS. FETT:  And Dibonay.

6          MR. HARVIS:  I'm sorry, that's news to me,

7    your Honor, because I thought we had looked at the

8    responses last night.  We can see their responses in

9    Exhibit 5, and this would be interrogatory number 1.

10          THE COURT:  They identify Forgione and

11   Cancellino.

12          MS. FETT:  And Dibonay.

13          MR. HARVIS:  Okay, so I apologize, I mis-

14   spoke, your Honor.  So those three were identified.

15   But all the more reason, in my opinion, why it's

16   appropriate to depose them.

17          THE COURT:  Also appropriate to tell me

18   about it on March 22nd, right?

19          MR. HARVIS:  If we had been asked and not

20   said it, your Honor, then yes.

21          THE COURT:  You were asked.  You were asked

22   what is -- discovery is done, right?  No, it's not,

23   this is what we need to do.  That's how it went down.

24          MR. HARVIS:  I'm just saying the spirit of

25   candor is, what do you know at that moment?  That's all

1  I'm saying is it was a mistake to not have a better

2  understanding but we did communicate our current

3  understanding at that time.

4          THE COURT:  Yeah, but that's important.

5          MR. HARVIS:  I'm not disputing that.

6          THE COURT:  If you didn't do your job ahead

7  of time, that's your problem, not theirs, not mine.

8          MR. HARVIS:  I completely agree, I

9  completely agree.

10          THE COURT:  Ms. Fett only told me about four

11  depositions that needed to be done and she didn't

12  mention documents, although documents were mentioned in

13  the letter asking for the extension.

14          MR. HARVIS:  I also just wanted to mention

15  that your Honor did say specifically that your Honor

16  even contemplated a supplemental discovery demand.

17          THE COURT:  Post-deposition.

18          MR. HARVIS:  Right.

19          THE COURT:  Not -- what else do you have to

20  say?

21          MR. HARVIS:  Let me think.  I feel like

22  that's pretty much it.  I feel like -- I just want to

23  say I believe that this has been, in my opinion,

24  handled in a transparent, good-faith way, where there

25  can't be an argument made that we didn't meet and

confer completely adequately with the City.  They were
on notice about this stuff for over a year.  I also
would just add that they don't have a merits objection
or they don't have a legitimate merits objection to
this material, much of which should have been submitted
-- mandatory disclosures.  So we think that the Court
should grant our application and compel them to produce
the material.

THE COURT:  Who is -- you still don't know
who the --

MR. HARVIS:  Driver.

THE COURT:  -- the driver is?

MR. HARVIS:  We know his last name from the
memo book that was reproduced but we don't know his
full name or shield number.

THE COURT:  But Sergeant -- is it Sergeant
Forgione?

MR. HARVIS:  No, it's Starrantino and he's
already a defendant.  The actual sergeant is a
defendant in the case.

THE COURT:  I see, so it's the driver.

MR. HARVIS:  Correct.

THE COURT:  You haven't received any
disciplinary files at all.

MR. HARVIS:  Not one, your Honor.

THE COURT:  Did you receive the unredacted summaries or -- I forget what they call them.

MR. HARVIS:  We did receive summaries; they were redacted.  We were never provided -- because we serve a specific interrogatory for this purpose, asking the City to identify the withheld categories of material, which we think is the spirit of Rule 26(b)(5) because it allows us, if appropriate, to challenge what they're withholding.  They never responded to that.  That's our interrogatory 9.  Then they redacted the summaries and the summaries I believe are from 2016 that were produced to us.  And then they never followed up with any files.  That's where we are.

THE COURT:  Even the -- what was not redacted, they didn't send you the files after that?

MR. HARVIS:  That's correct.

THE COURT:  Again, what is the documented injury here?

MR. HARVIS:  We have an expert report -- there was a bulge in his back that he never had before, and we have an expert report from a board-certified physician who is saying that it's causally related to this accident and it's permanent and disabling.

THE COURT:  What is it, though?

MR. HARVIS:  It's a bulging disk, your

1  Honor.

2       THE COURT:  Okay, so he has a bulging disk.

3  How old is this guy?

4       MR. HARVIS:  He's in his twenties, his mid-

5  twenties.

6       THE COURT:  How does he know that it wasn't

7  there before?

8       MR. HARVIS:  Well, we have a doctor saying

9  that this was the cause and I think that it's diagnosed

10  as a new injury when the MRI's are done.  That would be

11  the defense argument but I think that's in any case

12  with a bulging disk, they can make that argument.

13       THE COURT:  All right.

14       MR. BERGMAN:  Your Honor, if I may.  First,

15  plaintiff has represented numerous times during this

16  conference that the delay of this case was caused by

17  defense counsel, but the transcript of the March 22nd

18  conference flies directly in the face of those

19  allegations.  If your Honor will turn to page 2 of the

20  transcript, Ms. Fett stated at the bottom of the page

21  that the reason that the depositions weren't able to go

22  forward was because of her trial schedule.  It is true

23  that some of the ACC's assigned --

24       THE COURT:  That has nothing to do with not

25  producing documents, though, right?

1          MR. BERGMAN:  Yes, your Honor, but at the

2    time that the parties were contemplating taking

3    depositions, plaintiff didn't raise the fact that they

4    needed particular documents, just those depositions.

5          THE COURT:  It was raised in the joint

6    letter.

7          MR. BERGMAN:  Your Honor, not to take

8    depositions.  They indicated that they needed the

9    documents but this is the first indication that they

10   needed documents to take depositions.

11         THE COURT:  Everybody needs documents to

12   take depositions.

13         MR. BERGMAN:  Your Honor, they do have

14   documents, which is why they didn't get it during the

15   conference.  Discovery was substantially completed,

16   although --

17         THE COURT:  You didn't produce the

18   disciplinary files.

19         MR. BERGMAN:  Sorry, your Honor?

20         THE COURT:  The disciplinary files were

21   requested and you didn't produce them, right?  Not you,

22   not you, but --

23         MR. BERGMAN:  Of course, your Honor.

24         THE COURT:  Defendants.

25         MR. BERGMAN:  Yes, your Honor.  Your Honor,

1   we objected to producing those in our disclosures and

2   plaintiff waited until essentially the close of

3   discovery to then ask for those files.  It's not as if

4   we said we were turning them over and then didn't.  We

5   objected, plaintiffs waited --

6             THE COURT:  What is the basis for the

7   objection?

8             MR. BERGMAN:  Your Honor, there are numerous

9   bases.  One, we don't think it's proportional to the

10  needs of this case.  This is essentially a car

11  accident, and most of the files that have been

12  requested were from the sergeant who responded to the

13  scene after the incident.  So he may have some factual

14  knowledge but with respect to any force allegations

15  against him, he wasn't purported to be involved in the

16  force that was used in this case.

17            THE COURT:  Well, disciplinary files of the

18  -- in the redacted disciplinary histories for what I'll

19  call the main defendants, the guys who were in the car,

20  officers who were in the car, was there anything

21  indicated in their histories that was of a similar

22  nature, excessive force, anything like that?

23            MR. BERGMAN:  Yes, your Honor.  We certainly

24  indicated any files that would have been responsive and

25  then we never received a subsequent request for those

1  files.  To specifically answer your question, your

2  Honor, I have the documents in front of me --

3          THE COURT:  Why do you need a subsequent

4  request?

5          Did you ask for disciplinary files in your

6  first request?

7          MS. FETT:  Yes, we did, your Honor.

8          MR. HARVIS:  It's in document request 3,

9  your Honor, and that's Exhibit 4, your Honor.

10         THE COURT:  3(c), Internal Affairs resume

11  and underlying files.

12         MR. BERGMAN:  Your Honor, we objected.

13         THE COURT:  How can you object when I've

14  written on this and your office knows -- I think I

15  wrote on that in 2007.

16         MR. BERGMAN:  2006, your Honor.

17         THE COURT:  2006?

18         MR. BERGMAN:  I believe so, your Honor.

19         THE COURT:  The year I started.  You know

20  that's my standard practice.

21         MR. BERGMAN:  Yes, your Honor.

22         THE COURT:  So you're still objecting?

23         MR. BERGMAN:  We object --

24         THE COURT:  Have I changed my position over

25  time?

1    MR. BERGMAN:  I would imagine not, your

2 Honor.  That said, we did object at the outset because

3 we thought they weren't proportional to this given sort

4 of the complexity and sort of the requirements of this

5 case, specifically given that a lot of the allegations

6 against these officers which were unsubstantiated

7 didn't appear related to the incident in so far as

8 they're against a sergeant, who again is not purported

9 to have used any force here.

10    THE COURT:  But you produced indexes that

11 were unredacted for certain things for these officers,

12 which is at least a tacit admission that it's relevant.

13    MR. BERGMAN:  Your Honor, we produced things

14 that were similar in purported nature, that were

15 excessive force or I believe touched on veracity.  That

16 said, just because there's an unsubstantiated

17 allegation of force or veracity doesn't mean that we

18 think it's relevant.  It's just the type of case that

19 most closely correlates with the instant allegations.

20 Again, your Honor, plaintiffs were aware that they

21 didn't have these files when they were trying to

22 schedule the depositions and had not sent in a request

23 or asked us for them in the approximately four months

24 when they were contemplating dates.

25    MR. HARVIS:  That's not true.  They were in

1    our emails, repeated emails.  We specifically asked for

2    the files.  We asked for them in September and we asked

3    for them in November of 2017.

4              MR. HARVIS:  Your Honor, the parties were

5    discussing depositions in March.  While we're waiting,

6    your Honor, I just wanted to mention, the history that

7    was provided for the arresting officer is dated August

8    28th, 2015.  That's the date that the summary was

9    prepared, almost three years ago.

10             MR. BERGMAN:  Your Honor, plaintiffs are

11   making allegations regarding negligent hiring

12   retention.  Then the only pertinent information would

13   be with respect to things that happened prior to the

14   incident date.  Allegations that arose after would have

15   no bearing on whether or not there is a negligent

16   hiring claim, for example.

17             THE COURT:  I cut you off.  You were saying

18   something else.

19             MR. BERGMAN:  Sorry, your Honor, that

20   escapes me.

21             THE COURT:  It escapes me, too.  So you

22   didn't produce the underlying files because you say

23   it's not proportional.

24             MR. BERGMAN:  Yes, your Honor, among other

25   objections that we lodged.

1          THE COURT:  You refer to this as a car

2     accident.

3          MR. BERGMAN:  Yes, your Honor.

4          THE COURT:  That's your client's version of

5     it.

6          MR. BERGMAN:  Your Honor, our version of

7     events is that the defendant -- granted, the video is

8     unclear.  Either there was some sort of negligence or

9     he hit the car next to him that was parked and he fell.

10    Plaintiff testified during his 50(h) hearing --

11         THE COURT:  That's again your client's

12    version:  It's either negligence or he hit another car.

13    His version is that they ran him down.

14         MR. BERGMAN:  Yes, your Honor, but

15    plaintiff --

16         THE COURT:  And a jury could -- because the

17    video is unclear, a jury could say -- could agree with

18    him that they ran him down.  If they ran him down, how

19    are the disciplinary files disproportionate?

20         MR. BERGMAN:  Your Honor, the disciplinary

21    files that were sought by and large were against the

22    individuals that were driving the car rather than

23    against the sergeant, who wasn't there at that point.

24    Additionally, your Honor --

25         THE COURT:  Maybe you can make the argument

1  that the disciplinary files of the sergeant are not

2  proportionate to the claims but are there any -- I

3  asked you previously, were there any disciplinary files

4  for these two officers that were in the car?  You said

5  yes, there was stuff that was unredacted.  We didn't

6  think it's relevant because it's disproportionate.

7         MR. BERGMAN:  Your Honor, I'm looking at the

8  officers' disciplinary documents that were provided to

9  counsel, and I see that there is an allegation

10  regarding missing property but I do not see anything

11  regarding force that was not turned over.  Sorry, let

12  me rephrase, that there was a CCRB complaint that was

13  unsubstantiated involving force.

14         THE COURT:  Against one of the officers in

15  the car that was involved in the initial incident.

16         MR. BERGMAN:  I believe so, your Honor.  The

17  plaintiff actually didn't raise that in their motion

18  that's currently pending for that file.

19         THE COURT:  But they originally asked for

20  it.  They asked for IAB, CCRB indexes and underlying

21  files.

22         MR. BERGMAN:  Yes, your Honor.

23         THE COURT:  It's hard to say what's

24  proportional when we don't know the full extent of the

25  plaintiff's injuries.  If he has a herniated disk

1    that's caused by getting run over or run into by a

2    police vehicle, with herniated disks, the verdicts are

3    all over the place.

4            MR. BERGMAN:  Your Honor, if I may also,

5    just to provide the Court with a little bit more

6    information, we also objected to turn over

7    investigations that were open.  As we sit here today,

8    I'm not entirely sure whether there are similar

9    instances that are or were open at this time, but that

10   was an objection that we also lodged at the time.  So I

11   slightly mis-spoke earlier and I just want to correct

12   the record for that.

13           THE COURT:  The sergeant is a defendant,

14   currently.

15           MS. FETT:  Yes, your Honor.

16           THE COURT:  You've identified -- I

17   understand my Frails decision but how is excessive

18   force against the sergeant, when he wasn't involved in

19   the excessive force.  How is that relevant?

20           MR. HARVIS:  I agree that the relevance is

21   diminished but I would suggest that it would be -- the

22   vehicle would come under supervisory liability, which

23   allows for five different categories of supervisory

24   liability and subordinate conduct, assuming that the

25   officer created a custom that allowed it to happen such

1  as if he was grossly negligent in his supervision of

2  his subordinates, that would allow that supervisor to

3  be held liable for even the excessive force that was

4  done by these officers.  I agree these facts aren't --

5           THE COURT:  Yeah, but that's still one step

6  removed from that supervisor himself having allegations

7  of excessive force against him.

8           MR. HARVIS:  I think it would go along the

9  lines of the Ismael v. Cohen sort of logic that if you

10  can establish a pattern of conduct in the supervisory

11  context, where he's -- let's say the allegations of

12  excessive force are where his subordinates are

13  constantly hurting people, and instead of taking them

14  for treatment, they're bringing them to the precinct

15  and marking them down as apparently normal and

16  fabricating records about it.  I think we could develop

17  the sort of practice that the Cohen court was thinking

18  about.

19           THE COURT:  But this sergeant didn't --

20  these officers didn't say he was normal, right?

21           MR. HARVIS:  Someone said it.  It was

22  recorded in the command log that he was normal.

23           THE COURT:  But you said that was the desk

24  sergeant.

25           MR. HARVIS:  Correct.  He's the one who

1  wrote it down but we don't know where he got the

2  information from because we haven't deposed him.  But I

3  guess for me, it really is a step further than that

4  because I'm just learning now for the first time that

5  some of these redactions that were never explained to

6  us from these summaries in 2015 were things that were

7  just open.

8          MR. BERGMAN:  Your Honor, that was in our

9  discovery responses, that we were only producing things

10 that were open.

11         MR. HARVIS:  Right, but we didn't know

12 specific --

13         THE COURT:  That you were only producing

14 things that were open?

15         MR. BERGMAN:  Sorry, that we were not

16 producing things that were open.

17         MR. HARVIS:  Right.  We were not told that

18 any specific redactions to these documents were made

19 because the allegations were open.  They may have made

20 that in their boiler plate, general objections but we

21 didn't know that.  So not only are we stale but we had

22 no way of actually knowing or challenging --

23         THE COURT:  You got no privilege log?

24         MR. HARVIS:  We had a privilege log but it

25 did not say, these redactions were because this was

open, these redactions were because this was this

category. We had none of that information to

meaningfully challenge it, and that's why we asked for

in camera review. But under <u>King v. Condi</u>, your Honor

is only obligated to do in camera review if they can

justify with good cause the redactions that they've

made. So we think that there really shouldn't be any

redactions here.

MR. BERGMAN: Your Honor, in the privilege

log, it indicated that documents were being withheld

because there were open or pending allegations.

MR. HARVIS: It doesn't tell us which ones

or how many or that there were any specific redactions

made because of that or which page it was on.

MR. BERGMAN: It does.

MR. HARVIS: Which pages?

MR. BERGMAN: It gives page (ui) anyway.

For example, on defendant's Exhibits 722 to 725, it

indicates --

THE COURT: I want to go back to his

injuries. So he allegedly has a herniated disk or a

bulging disk.

MR. HARVIS: A bulging disk, that's right,

at the time -- we see the injury on the tape but then

they admit that he has -- scrapes off his arm. They're

1   taking photographs of his face and his wrist that we

2   haven't seen, so it's hard for us to say exactly the

3   extent of those injuries or what they will show.

4         THE COURT:  Well, he knows what his injuries

5   are.  He doesn't need someone to show him pictures to

6   know.  He can tell you what happened.

7         MR. HARVIS:  Well, he was in extreme pain.

8   The contemporaneous hospital records --

9         THE COURT:  Yeah, but the pain goes away

10   eventually.  Come on, how could he not know what his

11   injuries are?  A plaintiff has to know what their

12   injuries are.

13         MR. HARVIS:  We have an expert report that

14   says what they are and that they're, with a reasonable

15   degree of medical certainty, causally related to this

16   incident, that they're permanent.

17         THE COURT:  So how does -- wait, if you

18   haven't seen pictures, how does the expert know about

19   the scrapes and all that?  The scrapes aren't

20   permanent, right?

21         MR. HARVIS:  Nothing but the bulging disk is

22   alleged to be permanent, and that's not photographable.

23         THE COURT:  So you've got a bulging disk.

24         MS. FETT:  Your Honor, there's also a wrist

25   injury.

1          THE COURT:  What is the wrist injury, soft

2     tissue?  He's hurt -- he sprained his wrist or what?

3          MS. FETT:  Yeah, it's not a fracture.

4          THE COURT:  So he got a sprained wrist and a

5     bulging disk.  Is there any documented medical records

6     outside of this expert that discusses symptoms related

7     to the bulging disk?

8          MR. HARVIS:  Yes.  He had to go to physical

9     therapy for a series of at least six months.  He had

10    injections in his back, cortisone I believe, some kind

11    of injections.  I just want to note that this case for

12    us is about substantially more than this physical

13    injury and the actual moment of force.  It's about the

14    fabrication of evidence that is really egregious here,

15    where they claimed repeatedly in sworn documents that

16    he flailed his arms.  I don't know if your Honor had

17    the chance to actually look at the video.

18          THE COURT:  Yes.

19          MR. HARVIS:  But it's very difficult for me

20    or I think a jury to understand why sworn allegations

21    are being repeatedly made that he's flailing his arms.

22    That's the only thing that they say justified his

23    arrest.

24          THE COURT:  How long -- he was locked up for

25    how long?

```
1              MR. HARVIS:  24 hours, and then he was
2    facing trial.  He had to go to hearings, he had to
3    appear in court regularly.
4              THE COURT:  How long was the litigation?
5              MR. HARVIS:  The criminal case?
6              THE COURT:  Yeah.
7              MR. HARVIS:  I have to check.  We think it
8    was about a year, your Honor, but certainly long enough
9    for the case to go to hearings.
10             THE COURT:  Did he have a retained attorney
11   or was he provided an attorney through 18(b) Legal Aid?
12             MR. HARVIS:  Legal Aid, I think.
13             THE COURT:  So no out-of-pocket for the
14   attorney.  What about lost wages, anything?
15             MR. HARVIS:  We're not claiming lost wages.
16             THE COURT:  Okay.
17             MR. HARVIS:  Just because we don't know if
18   we can show causation on the loss of his job.
19             THE COURT:  A bulging disk, injections, PT
20   for six months.
21             MR. HARVIS:  The expert that we retained
22   does put some numbers on his ongoing future expected
23   medical expenses.
24             Did we bring a copy of the report?
25             MS. FETT:  I don't have it.
```

1          MR. HARVIS:  We don't have a copy with us,

2    your Honor, but I just wanted to say there are -- when

3    you're so young and you have an injury like that, if

4    you can prove causation, there's certainly a

5    possibility that it could be problematic later in life.

6          THE COURT:  So he's betting the farm on

7    this, huh?

8          MR. HARVIS:  I'm not sure --

9          THE COURT:  Have you made a statement

10   demand?

11         MR. HARVIS:  We did early on.  There's been

12   no offer.

13         THE COURT:  Is this a no-pay case?

14         MR. BERGMAN:  No, your Honor, it's not.

15         THE COURT:  How come you didn't make an

16   offer after getting a demand?

17         MR. BERGMAN:  Your Honor, I'm not sure that

18   we did.  I know that we have authority on the case.  I

19   don't think it's quite to the level that plaintiffs are

20   asking for, but this case has been evaluated and it was

21   not marked no pay.

22         THE COURT:  Didn't I say you're over-

23   litigating this case?  Didn't I tell that to you and

24   Ms. Bardauskis?

25         MS. FETT:  You didn't use the word over-

1   litigating but you hoped that we could reach a

2   settlement.  Plaintiff made a demand in February of

3   2017 with the very first ACC.  We've been open to

4   settlement discussions.  What happened after Mr. Oliner

5   left the office -- if I just may take a moment, your

6   Honor.

7            Mr. Oliner at the initial conference

8   specifically asked for you not to set a schedule

9   because he thought he could settle the case, and you

10  didn't set a schedule.  You held it in abeyance.  I had

11  already given him a demand by that initial conference.

12  We never received an offer.  Then I believe it was

13  months later, the case was reassigned.  What I did

14  affirmatively was give Ms. Bardauskis everything I had

15  given Mr. Oliner because I believe I gave him documents

16  pre-discovery to see if we could work this out.

17           I had to give her everything over again

18  because for some reason, she didn't have it from the

19  prior attorney.  So I gave her everything again, gave

20  her our demand and said, we're reasonable, let's see

21  what we can do.  It was a sense of just starting over.

22  I do believe that Ms. Bardauskis and I were agreeing a

23  lot on a lot of things, and that's why you see my

24  emails asking for things and pushing her, but she was

25  also agreeing to get it to me, and so we felt we didn't

1    need to bring it to the Court.

2              Your Honor has gone off the record on a

3    couple of conferences to try to get it done, and what

4    your Honor had said was, don't spend money on experts,

5    why can't we get this done?  My impression from our

6    last conference was that defendants are I think nowhere

7    near five figures.  I think we're just so far apart.  I

8    believe that the negotiations haven't been in good

9    faith because I made this demand in February of 2017

10   and your Honor has been encouraging defendants to make

11   some kind of offer.

12             THE COURT:  Was it a six-figure demand?

13             MS. FETT:  Yes.

14             MR. HARVIS:  Very low, very low six figures.

15             MS. FETT:  Low six figures.

16             MR. HARVIS:  As low as it gets.

17             THE COURT:  Bulging disk, 24 hours, a year

18   of criminal case, six months of PT, injections.  That's

19   not worth at least five figures, where the video is

20   unclear?

21             MR. BERGMAN:  Your Honor, our office is

22   constantly evaluating cases.  At the outset, I do not

23   believe that (ui) on the case.  There have been

24   subsequent conversations internally and we're still

25   continuing to evaluate it.  We do understand --

1          THE COURT:  The longer it takes to evaluate

2     it, the more continuing evaluation you have, the more

3     it costs your client in time and effort.  And it's hard

4     to come up with a proportionality argument when -- I

5     don't understand why you need more time.  You know what

6     you know and apparently, you don't want to know any

7     more because you don't want to do any more discovery.

8          MR. BERGMAN:  Well, your Honor, we certainly

9     want to take depositions of the three defendants and

10    the plaintiff.  That said, obviously, as I just came on

11    to this case, I will be bringing it back to the office

12    and reflecting your Honor's questions.

13         THE COURT:  Are there pictures of his

14    injuries?

15         MR. BERGMAN:  Your Honor, there's a mug shot

16    pedigree form that I observed, that I believe was

17    turned over, that shows at least his face in apparently

18    normal condition.  I understand that there may have

19    been photos taken and our office is currently

20    attempting to receive those photos, but I have not

21    personally seen them yet.

22         THE COURT:  Who took them?

23         MR. BERGMAN:  Your Honor, it's my

24    understanding -- this is a conversation that

25    plaintiff's counsel and I actually talked about last

1  night when we met and conferred.  We are in the process

2  of trying to receive those and I believe there were

3  some of the investigators that were --

4           THE COURT:  What does that mean, we are in

5  the process of trying to receive them?  I know it's

6  like pulling teeth getting anything from the police

7  department.  I've been doing this for twelve years.

8           MR. BERGMAN:  Yes, your Honor.  We've

9  contacted our clients and expressed the immediacy that

10  we need them and we are following up regularly --

11           THE COURT:  When was the first time that

12  they were asked for?

13           MR. BERGMAN:  Your Honor, we do not know --

14  let me rephrase that, your Honor.  We specifically most

15  recently asked for them I believe either on the 10th or

16  the 20th.  There was -- requests that were put on on

17  those dates.  I don't specifically remember which of

18  those periods, but we've also been working with P.D.

19  legal to try to get those documents in an expedited

20  fashion.

21           THE COURT:  From the perspective of

22  continuing to evaluate, you'd think you'd want to see

23  those, right?

24           MR. BERGMAN:  Yes, your Honor.

25           THE COURT:  And you haven't sent him to an

1   expert, have you?

2           MR. BERGMAN:  We haven't sent plaintiff to

3   an expert?

4           THE COURT:  Yeah, to examine him, to look at

5   the medical records and to opine on whether he has a

6   bulging disk and whether the bulging disk is causally

7   related.

8           MR. BERGMAN:  Your Honor, I think we only

9   recently learned that plaintiff intended to use an

10  expert.  We're in the process, from what I understand,

11  of trying to obtain one, but that is an ongoing --

12          THE COURT:  Ms. Fett, what have you got to

13  say about that?

14          MS. FETT:  That's completely incorrect.  We

15  have said from the beginning that we -- probably in the

16  first conference, I said we may.  But as the litigation

17  went on, I was very firm that our client was going to

18  be seeing an expert, and we produced our expert

19  disclosures according to the schedule.

20          THE COURT:  When was that?

21          MS. FETT:  Our disclosures were due April

22  13th and they've all been produced.

23          MR. BERGMAN:  Your Honor, I do believe we

24  received those on the 13th.

25          THE COURT:  Did I give them a date to

1 produce --

2          MS. FETT:  You did not, your Honor.

3          THE COURT:  Did we discuss that at the March

4 22nd conference?

5          MS. FETT:  I think so, your Honor.

6          MR. BERGMAN:  Your Honor, I believe Ms.

7 Bardauskis followed up with chambers and indicated that

8 we were supposed to provide our response or indicate

9 who our experts were by the close of discovery on the

10 18th.  Then I believe that the order contemplated

11 depositions being done of experts during the period

12 where we work on the JPTO, but I could be mistaken as

13 to that.

14          THE COURT:  It says expert disclosures due

15 April 13th.  That's what the docket says.

16          MR. BERGMAN:  Yes, your Honor.

17          THE COURT:  Discovery to close on May 18th.

18 Does the transcript give any further discussion?

19          MR. BERGMAN:  I believe it does, your Honor.

20          MR. LARKIN:  On page 10, your Honor, there's

21 a discussion about it, where I believe Ms. Fett at the

22 bottom states, I'm still going forward on that

23 understanding.  Everything has to be completed,

24 including if there's going to be expert discovery by

25 May 18th.  That's the bottom of page 10, and then on the

1  next page, page 11, line 20, your Honor says, April 13th

2  for any expert disclosure from the plaintiff.

3        THE COURT:  So you have until May 18th.

4        MR. LARKIN:  Right.

5        THE COURT:  We'll give the defendant until

6  May 18th.  Have you set that up yet?

7        MR. BERGMAN:  Your Honor, we're in the

8  process of that.

9        MR. HARVIS:  Can I raise one other thing,

10  your Honor?

11        THE COURT:  Sure.

12        MR. HARVIS:  We just haven't touched on the

13  issue of the electronic communications and I just

14  wanted to mention that there can be no dispute that

15  document request number 6 served on March 13th, 2017

16  asked these officers to produce relevant electronic

17  communications, and their responses are nonsubstantive.

18  There's no indication that any search was conducted.

19  The only reason we have any text messages is because

20  they happen to be in the D.A. file, which I've never

21  even seen before.  So we believe that, especially given

22  these concerning text messages, that they ought to do a

23  search.  They're clearly in communication about this.

24  That's Exhibit 3, your Honor.

25        THE COURT:  What document request?

1          MR. HARVIS:  It's our document request

2    number 6 from Exhibit 4, your Honor.

3          THE COURT:  So what happened there?

4          MR. BERGMAN:  Your Honor, we provided the

5    text messages that were in the District Attorney's file

6    between some of the individuals at issue here but the

7    nature of the request was incredibly broad.  It was

8    unclear exactly what they were referring to.

9          THE COURT:  Well, you have all your general

10   objections that you make.

11         MR. BERGMAN:  Yes, your Honor.

12         THE COURT:  And then you say,

13   notwithstanding and without waiving or in any way

14   limiting the general objections or these specific

15   objections.  Defendants state that they are not

16   withholding any information on the basis of the

17   objections herein and are continuing to search for

18   information responsive to this request and it will be

19   produced within thirty days.  Whether it was Ms.

20   Bardauskis or whomever, all they do is look at what

21   other people -- entities gave the City and see if there

22   are any text messages and then produce those?

23         MR. BERGMAN:  Your Honor, there were the

24   texts in the D.A. file.  It's my understanding that the

25   officers were asked if there were text messages, but I

1    can go back and confirm that.

2              THE COURT:  These are text messages from --

3              MR. HARVIS:  Between the two main

4    defendants.

5              THE COURT:  Yeah, I'm just trying to look at

6    the -- this is --

7              MR. HARVIS:  They're getting ready to meet

8    with the D.A. and they want to make sure they know --

9              THE COURT:  What month and year.

10             MR. HARVIS:  Let me see if we have that.

11   Oh, yes, March 22nd.  I don't know the year.

12             MS. FETT:  It's got to be 2016.

13             MR. HARVIS:  It would make sense for it to

14   be 2016.

15             THE COURT:  So what would you suggest we do

16   with that?

17             MR. HARVIS:  I think that they should be

18   required to provide a substantive response that either

19   indicates provides responsive material, which we know

20   there is at least these messages, and says that a

21   search has been conducted and there's nothing that's

22   been provided.  In other cases, the judges have ordered

23   -- Judge Levy for example has ordered the defendants to

24   just execute a thing that says, I conducted a search of

25   my emails and phone and I see no relevant messages with

1    this officer.  I've reviewed them.  Or certification at

2    the very least by counsel that that's happened.  Write

3    it, which is what the rules require.

4              MR. BERGMAN:  Your Honor, I don't have our

5    requests in front of me but I'm sure that we asked for

6    similar information, and we didn't receive any

7    certification from plaintiff that he went through his

8    phone and told everybody who he got into accident with

9    and what occurred in that instance.  Asking for a

10   certification on this kind of flies in the face of the

11   general discovery that takes place in these cases.

12             MR. HARVIS:  I'm just asking for a response

13   consistent with Rule 34, where if they're -- they have

14   to tell us what they're withholding and they have to

15   tell us what the actual answer is to what we're asking

16   for.  So here, we're just getting, I'm going to tell

17   you in thirty days, and then nothing.  We're not seeing

18   any objections, so I think they should be compelled to

19   answer substantively.

20             THE COURT:  Have you figured out who the

21   driver is?

22             MR. BERGMAN:  Your Honor, I first found out

23   that this was an issue last night at approximately

24   11:30.  That said, plaintiff I believe was provided the

25   roll call.  If they knew the last name, then they

should have been able to discern the identity of the

individual, to the extent they want to take a person's

deposition.

THE COURT:  Do you know the last name of the

driver?

MR. HARVIS:  Yeah.  We have it in the --

it's a very common last name and we have it -- I have

to check the legibility of the roll call because just

from glancing through it recently, I'm not 100% sure

that it's of a usable form.

THE COURT:  They're handwritten roll calls?

MR. HARVIS:  No, it's typewritten but we

usually get the after they've been photocopied twenty

times.  So often, you can't make it out.  But that

person clearly is a witness with knowledge under Rule

26, so I'm not sure why we need to go hunting through

documents to find it, but certainly we'll do that if

it's possible.  I have no objection to doing that.  The

rules allow them to refer us to documents if they want

to do that, but we haven't gotten a reference to the

page.

THE COURT:  Let's go off the record for a

second.

(Tape off, tape on.)

THE COURT:  -- granting in part.

1              MR. LARKIN:  Are we on the record?  I'm

2    sorry.

3              THE COURT:  Are we on the record?

4              THE CLERK:  We were off the record.

5              THE COURT:  Okay.  Thank you, Mr. Larkin.

6              MR. LARKIN:  I'm sorry, Judge.

7              THE COURT:  My apologies.  We're back on the

8    record.  We had a colloquy that should have been on the

9    record that inadvertently wasn't, so I'm going to issue

10   the ruling.

11             The motion to compel is granted in part.

12   The depositions of the ADA's -- there are two of them,

13   IAB and the Queens North officer who did the initial

14   IAB investigation, those are denied.  The depositions

15   of the plaintiff and the defendants will go forward.

16             MR. HARVIS:  The fourth officer, your Honor,

17   that was never disclosed, we would ask that that person

18   -- a deposition be allowed for that person.

19             THE COURT:  The driver?

20             MR. HARVIS:  The driver.

21             THE COURT:  Yes, you can have his

22   deposition.

23             MR. HARVIS:  Thank you, your Honor.

24             THE COURT:  The specific items requested on

25   pages 2 and 3 of the motion, documents and other

1　things, those are granted in part.  As far as text

2　messages between officers Zheng and Chen, defendants

3　are to double back to those officers, ask them to do a

4　search of their cell phones.  If there is anything that

5　is relevant that are in the phones that has not already

6　been produced to the -- it was to the District

7　Attorney?

8　　　　　　MR. BERGMAN:  I believe so, your Honor, yes.

9　　　　　　THE COURT:  Those are to produced along with

10　a declaration from them that they've done the search,

11　they've produced what's relevant.

12　　　　　　The disciplinary records for the two

13　officers that were not redacted, the underlying

14　records, IAB, CCRB, whatever, those records are to be

15　produced.  I'm denying it for the sergeant.  I see it

16　as being tangential at best and disproportionate to the

17　claims.

18　　　　　　MR. HARVIS:  May I just note our exception,

19　your Honor, to the extent that there are any --

20　　　　　　THE COURT:  Is that a state court practice,

21　an exception?

22　　　　　　MR. HARVIS:  I'm sorry.  I see it in

23　transcripts all the time so I think people do it.

24　　　　　　THE COURT:  I don't know what it means.

25　　　　　　MR. HARVIS:  I just wanted -- what I wanted

to do is just to say that as to the excessive force,
that makes sense.  If there's something where someone
was not brought for medical treatment promptly, I do
believe that's squarely relevant here within the
allegations against the sergeant, and that that ought
to be an exception to the ruling.

        THE COURT:  Did you produce the indexes or
the histories for the sergeant?

        MR. BERGMAN:  Yes, your Honor.

        THE COURT:  Go back and look at the clean
copy, the unredacted copy.  If there's anything along
those lines, not bringing someone in for medical
treatment, produce the underlying records.

        MR. BERGMAN:  Yes, your Honor.

        THE COURT:  If there's not, then let counsel
know.

        MR. BERGMAN:  If I may just ask for a
clarification on that point.  I don't know of the
existence of any but with respect to any such
investigation that's open, are we required to turn
those over?

        MR. HARVIS:  May I be heard on that, your
Honor.

        THE COURT:  Yeah.  I didn't talk about that
in _Frails_, did I?

1    MR. HARVIS:  Not in _Frails_ but Judge Ellis

2  has a decision from the Southern District that's

3  squarely on point about this.  He considers the

4  argument about open files and rejects it out of hand.

5  I'm happy to provide it in a supplemental letter to

6  your Honor.

7    THE COURT:  I don't know how that makes a

8  difference because if -- regardless of outcome,

9  substantiated or unsubstantiated, if they're to be

10  produced --

11    MR. HARVIS:  Well, they also tend to leave

12  these things open for years and years, so sometimes

13  it's never closed.

14    THE COURT:  It doesn't matter.  Regardless

15  of outcome, if they're produced, substantiated or

16  unsubstantiated, then why does it matter whether it's

17  open or closed?

18    MR. BERGMAN:  Your Honor, there are numerous

19  reasons why.  Since it actually does or can impact the

20  investigation, in a case like this, for example, where

21  there's already been some sort of press attention given

22  to it, it can implicate or affect the investigation

23  itself.  Also, to the extent that officer --

24    THE COURT:  If we have a confidentiality

25  order in place and can't disclose that, how would that

1    affect the investigation?  It's not going to the press.

2           MR. BERGMAN:  Your Honor, also, if the

3    officers are required to provide testimony on things

4    that are open, it could also impact the investigation

5    in some regard.

6           MR. HARVIS:  What Judge Ellis looked at,

7    your Honor, were the requirements for actually

8    asserting the law enforcement privilege, which is what

9    they're trying to do here, and they're onerous.  If you

10   look at King v. Condi, there have to be declarations.

11   There has to be a specific factual showing as to how

12   the investigation is going to be impacted from a high-

13   ranking official, those sort of things.  It can't be

14   generalized, it might do this, it might do that.  If in

15   a specific instance, something is threatened, allow

16   them to seek a protective order.  That's what the rules

17   provide for.

18          THE COURT:  I don't understand how it

19   affects a law enforcement privilege.  If officer

20   statements, testimony given in the context of an IAB or

21   CCRB investigation is produced at the end of the day,

22   regardless of whether it's substantiated or

23   unsubstantiated, how does that implicate the law

24   enforcement privilege?

25          MR. BERGMAN:  Your Honor, it's more that the

1  officers have allegations pending against them and

2  they're providing testimony with respect to same.  So

3  it's a two-fold issue:  One, it actually impacts the

4  officers in so far as they're providing testimony --

5       THE COURT:  I see, they're providing

6  testimony in this case.

7       MR. BERGMAN:  Potentially, your Honor, if

8  they're asked questions at depositions, for example,

9  along those lines.

10       THE COURT:  You can deal with that with an

11  objection at a deposition, instruction not to answer,

12  right?

13       MR. BERGMAN:  Potentially, your Honor.

14       THE COURT:  But at the same time, Mr. Harvis

15  and Ms. Fett should be entitled to see this open

16  complaint and go talk to the complaining witness, see

17  what they have to say, see if somehow they can get it

18  into the case, which is difficult.

19       MR. HARVIS:  It is, your Honor, but this is

20  discovery, not trial, so we are apparently given

21  more --

22       THE COURT:  Even open investigations.

23       MR. HARVIS:  Thank you, your Honor.  Just

24  for clarification, I would like -- if your Honor is

25  inclined, I would like these determinations to be made

1    based on current summaries of these officers' history.

2    For all we know, there are major things that have

3    developed here that would allow us to make 404(b) and

4    pattern and practice allegations or at least --

5              THE COURT:  Subsequent events?

6              MR. HARVIS:  Subsequent events, yes, your

7    Honor.  It depends on the facts, certainly, but to

8    suggest that we're not entitled to see current

9    summaries because they're per se inadmissible, I think

10   is unfair under the state of the law in the Second

11   Circuit.  I think the showing is difficult.

12             THE COURT:  So you want them to rerun the

13   summaries?

14             MR. HARVIS:  Right.  I don't think we should

15   have to rely on one set literally from two weeks after

16   the incident.  I think it should be ones that are

17   current and then if they want to have an argument about

18   the thing, it's an argument for trial about whether or

19   not they're admissible.  I will tell your Honor we know

20   that Officer Zheng, within a few months of this

21   incident, struck someone else with a vehicle.  We

22   haven't seen it in any of the summaries we've been

23   provided with but there was another litigation where

24   they had to pay $165,000 because he hit someone's knee

25   backing up the car, the police car.

1          THE COURT:  By accident?

2          MR. HARVIS:  Well, he says so.

3          THE COURT:  Was it a suspect?

4          MR. HARVIS:  No.  He was going to apprehend

5   a suspect and he put the car in reverse and I guess

6   slammed into this guy.  We have the accident report

7   from that case.

8          THE COURT:  Did he take off and tail the

9   suspect?

10         MR. HARVIS:  No, he stayed.  He was with

11  other officers.  He stayed but he put down in the

12  accident report injuries, zero, even though this person

13  had to have two knee surgeries.  So we know that there

14  are other issues with driving regarding this officer

15  and we think we might be able to --

16         THE COURT:  But that's not --

17         MR. HARVIS:  It's not excessive force.

18         MR. BERGMAN:  Your Honor, if there's a

19  negligence claim here, we'd ask that this case be

20  dismissed.

21         THE COURT:  No.  Backing into someone is

22  very different.

23         MR. HARVIS:  Well, lying about it.

24         THE COURT:  Lying about it is not.

25         MR. HARVIS:  That's what I'm saying.  We

1   don't know what (ui) so I don't have the current

2   summaries.  It's really about the disclosure for us

3   because we just want to know what arguments we can

4   make.

5              THE COURT:  Identify this incident and

6   that's in the mix.  Find out -- there was a CCRB or an

7   IAB?

8              MR. HARVIS:  I just know there was a

9   lawsuit.  Presumably, someone -- there was a person who

10  was injured while he was on duty, so I would think

11  there would be --

12             THE COURT:  It was a lawsuit?

13             MR. HARVIS:  Oh, yeah.  They settled it for

14  $165,000.

15             THE COURT:  In state court?

16             MR. HARVIS:  State court.

17             THE COURT:  Give him the date of the

18  incident.  There may not be a CCRB or an IAB.  If

19  there's not, there's no problem.  If there is, raise it

20  with me.

21             MR. HARVIS:  Okay.

22             THE COURT:  But I don't want to recreate the

23  wheel.  I think subsequent incidents are -- it's going

24  to be hard to get them in.

25             MR. HARVIS:  Okay.

1          THE COURT:  I'm just looking at the

2    requests.

3          MR. HARVIS:  Of course.

4          THE COURT:  That's the only exception, which

5    is the exception I mentioned to the ESI and the

6    disciplinary and personnel records.  Everything else

7    will be produced.  Defendants still have time for their

8    expert, so that's not a problem.  A lot of stuff

9    they've asked for, how long is it going to take you to

10   get it?  You're going to produce it before you do any

11   depositions because I don't want to hear, we need to do

12   additional depositions because we didn't have the

13   documents in time.

14          MR. BERGMAN:  Yes, your Honor.  Typically,

15   it takes us approximately thirty days to get those

16   sorts of documents.  We put the requests in.  In this

17   case --

18          THE COURT:  Thirty days?

19          MR. BERGMAN:  Your Honor, as I said, it's

20   typically that, or at least that's what we normally

21   contemplate.  I can try to get them expedited but I

22   don't --

23          THE COURT:  No, no.  My hesitation was that

24   I don't think -- typically, I don't think you can get

25   it done in thirty days.  If you go back to them and

1   say, give us X, Y and Z, we're lucky if it's thirty

2   days.

3              MR. BERGMAN:  If your Honor would be

4   inclined to provide more time, then we would certainly

5   take that time.

6              THE COURT:  45 days.  Then you take your

7   depositions.  You've got four defendants or three

8   defendants, a driver, and the plaintiff, and that's it.

9              MR. BERGMAN:  That's it.

10              THE COURT:  You can get those done in a

11   couple of weeks.

12              MR. HARVIS:  I just want to be clear, that's

13   it for everybody.  There are no other depositions in

14   the case, correct?  They can't tell us they want to

15   depose other people now.

16              THE COURT:  That's all that was either asked

17   for prior to the close of discovery on March 19th or --

18   asked for and agreed to or -- I don't know how to

19   characterize the driver.

20              MR. HARVIS:  Late disclosure.

21              THE COURT:  Late disclosure.

22              MR. HARVIS:  I just wanted to clarify that

23   it was a bilateral ruling and it wasn't just that

24   plaintiff --

25              THE COURT:  Yeah.

1          MR. BERGMAN:  If I may, I did recently

2    become aware of a series of releases that we need to

3    send plaintiff for medical documents.  Will we be

4    permitted to request those documents under the

5    discovery schedule?

6          MR. HARVIS:  May I be heard on that, your

7    Honor?

8          THE COURT:  Not yet.  What releases?

9          MR. BERGMAN:  Your Honor, I believe we need

10   releases for medical imaging documents, with respect to

11   insurance companies, release to access MRI films

12   reviewed by Stanley Friedman, and then an OCA release

13   for no-fault records from Countrywide Insurance.

14         THE COURT:  OCA release did you say?

15         MR. BERGMAN:  I believe I just said a

16   release, your Honor.

17         THE COURT:  Oh.

18         MR. BERGMAN:  And for an individual named Ju

19   Lin (ph), who -- I'm not entirely sure what the nature

20   of his practice is but I was informed that we do need

21   access to I believe medical records.

22         MR. HARVIS:  Your Honor, we basically gave

23   them this person's entire life history of medical

24   releases, literally every single provider that we could

25   even see anywhere in the records, which I'm pretty sure

1    includes these people, going back like fifteen years.

2    We've been beyond exhaustive.  If those people were

3    left off, they will get them.  We don't have any

4    objection.  We want them to have the records.  I just

5    want to say I'm pretty sure they already have them.

6    This is the first we're hearing about it, except for an

7    email on Friday.

8              THE COURT:  So you think they already have

9    the releases.

10             MR. HARVIS:  I know we sent them every

11   single thing, dozens of them.

12             THE COURT:  And you don't have the releases.

13   You're saying you don't.  You looked at the records.

14             MR. BERGMAN:  I have to apologize.  I'm not

15   entirely sure.  I was informed that we don't but I

16   myself have not done a search.

17             THE COURT:  Confirm that you do or you

18   don't.  If you don't, have your client execute the

19   releases and get them within the next ten days.

20             MR. HARVIS:  No problem.  Can it be ten days

21   after they tell us whether they have them or not?

22             THE COURT:  How soon can you tell them, end

23   of the week?

24             MR. BERGMAN:  Yes, your Honor.

25             MR. HARVIS:  That's fair.

1          THE COURT:  So 45 days is -- I'll put

2   documents to be produced by June 15th.  You'll have --

3   I'll give you a little more time, until July 13th to

4   complete the depositions, including any experts.  If

5   you get the releases -- I'll give you until May 9th.

6          MR. HARVIS:  Thank you, your Honor.

7          THE COURT:  If you get those, hopefully

8   thirty days, June 9th, let's give you until June 15th.

9   You're going to want to get those records to your

10  expert before he examines Mr. Rodriguez?

11         MR. BERGMAN:  I imagine so, your Honor, but

12  I also don't have the records.

13         THE COURT:  Plaintiff to be examined by

14  defendants' expert by June 29th and the expert report --

15  when did I say discovery would close?

16         MR. HARVIS:  The 13th, your Honor, I believe.

17         MS. FETT:  May 18th, I believe.

18         MR. HARVIS:  Now it's July 13th, I believe.

19         THE COURT:  Fact discovery is to close July

20  13th.  Defendants' expert report July 20th and I'll give

21  you two weeks, until August 3rd, to do the expert

22  depositions.

23         MR. HARVIS:  Both Ms. Fett and I are going

24  to be out of town in that latter part of July, your

25  Honor.  I'm just thinking ahead as a practical matter.

We then have trial beginning before Judge Hall.

THE COURT:  Is it your practice to take their expert depositions?

MR. HARVIS:  Fair enough, probably not, but it's more about them taking our expert's deposition.

THE COURT:  They can take your expert's deposition.  They've got the report, right?

MR. HARVIS:  Yes.

THE COURT:  They can do it tomorrow.

MR. HARVIS:  Yeah, I just wanted to mention it so it's on everyone's radar that that's going to be a tough couple of weeks for us and it's actually during that time.

THE COURT:  That's fine.  You'll have until August 3rd to complete the expert depositions.  You can do it before then if you want.

MR. HARVIS:  Okay.

THE COURT:  But that's the schedule, or you could settle the case.  It's up to you.

MR. HARVIS:  Fair enough.

MR. BERGMAN:  Thank you, your Honor.

THE COURT:  Even though I've granted the motion in part, I'm not assessing costs.  Rule 37 says it's mandatory unless there's a good reason why you didn't produce the documents.  Substantial

justification I think is the phrase, is that right?

        MR. HARVIS:  I think so, your Honor.

        THE COURT:  Close enough.

        MR. HARVIS:  Okay.

        MR. BERGMAN:  Thank you, your Honor.

        THE COURT:  Thank you.

              * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct

19  transcript from the electronic sound recording of the

20  proceedings in the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    May 3, 2018