1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    --------------------------------X
                                      :
 4    HEINS RODRIGUEZ,                :
                                      :   16-CV-05861 (NG)
 5                 Plaintiff,         :
                                      :
 6                   v.               :
                                      :   225 Cadman Plaza East
 7    CITY OF NEW YORK, et al.,       :   Brooklyn, New York
                                      :
 8                 Defendants.        :   August 8, 2018
      --------------------------------X
 9
                TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
10              BEFORE THE HONORABLE RAMON E. REYES, JR.
                      UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:        GABRIEL PAUL HARVIS, ESQ.
                                BAREE N. FETT, ESQ.
14                              Elefterakis Elefterakis &
                                  Panek
15                              80 Pine Street, 38th Floor
                                New York, New York 10005
16
      For the Defendant:        ZACHARY RUSSELL BERGMAN, ESQ.
17                              KEVIN JAMES KELLY, ESQ.
                                New York City Law Department
18                              100 Church Street
                                New York New York 10017
19
      Court Transcriber:        RUTH ANN HAGER, C.E.T.**D-641
20                              Typewrite Word Processing Service
                                211 North Milton Road
21                              Saratoga Springs, New York 12866

22

23

24

25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service
```

1  (Proceedings began at 11:03 a.m.)

2  THE CLERK:  Civil cause for a motion hearing, docket

3  number 16-CV-05861, Rodriguez v. City of New York.  Counsel

4  for plaintiff, please state your name for the record.

5  MR. HARVIS:  Gabriel Harvis for plaintiff Heins

6  Rodriguez.  Good morning, Your Honor.

7  THE COURT:  Good morning.

8  MS. FETT:  Baree Fett for plaintiff Heins Rodriguez.

9  Good morning, Your Honor.

10  THE COURT:  I'll say a final good morning when

11  everyone is done, okay?

12  MR. BERGMAN:  Good morning, Your Honor.  Zachary

13  Bergman for defendant.  I'm joined from -- corporation

14  counsel.  I'm joined by Kevin Kelly, Michelle Jacobs [ph.] and

15  then the executive director of the Civil Litigation Unit with

16  the NYPD Elizabeth Bates [ph.], and NYPD agency attorney,

17  Monique Kamar [ph.].  Good morning, Your Honor.

18  THE COURT:  Good morning.  Okay.  We have not

19  exactly competing motions, but two motions to discuss: one to

20  extend discovery and that's from the defendants; and two, for

21  sanctions, and that's from the plaintiff.

22  Let's first start with extension of discovery.

23  Mr. Bergman?

24  MR. BERGMAN:  Yes, Your Honor.  Defendants requested

25  an extension of discovery in this case because of wage

disclosures made by plaintiff.  On the literal eve of the
close of discovery we received some supplemental disclosures
from plaintiff which for the first time indicated that
plaintiff was seeking injuries with respect to anxiety,
depression, post-traumatic stress disorder, a post-concussive
syndrome.  Additionally, provided HIPAA releases for four new
treating medical providers and one or two pages of medical
documents.

        THE COURT:  One or two pages?

        MR. BERGMAN:  Yes, Your Honor.  And so --

        THE COURT:  That's for PTSD --

        MR. BERGMAN:  Your Honor --

        THE COURT:  -- post-concussive disorder and all that
other stuff?

        MR. BERGMAN:  Your Honor, we didn't receive any
documents to date respect to the psychological -- the
purported psychological injuries.  Rather, it focused on
reported physical head injury.

        THE COURT:  Okay.

        MR. BERGMAN:  Also, Your Honor, it's worth
mentioning that that document was -- or indicated that there
was an examination of the plaintiff the same day we had our
last conference on the telephone.  And that document was
actually fashioned in the manner of an expert report, though
during that conference it was indicated that plaintiff should

1 not be proceeding within that fashion.  And plaintiff in this

2 case did not indicate that it was expert report, but that was

3 the format that the report took and that it did not really

4 appear to have any sort of treating purpose.  Rather, it

5 appeared to be some sort of statement referring him to another

6 doctor and indicating that there was some sort of head injury

7 that resulted from this incident despite the fact that on the

8 incident day the CAT scan was taken it came back negative.

9          THE COURT:  So you want to -- you want additional

10 time to get documents and take depositions and have him

11 examined?

12          MR. BERGMAN:  Your Honor, at this point we're not

13 entirely sure what the medical documents are going to show, so

14 I'm not entirely -- defendants are not entirely clear whether

15 or not depositions of the doctors, for example, are going to

16 be needed.  But to the extent that plaintiff is indicating

17 that he's got new injuries and that he received a treatment,

18 defendants want to be able to question plaintiff about the

19 extent of those injuries and the doctors he saw and to discuss

20 the symptoms thereof.

21          Additionally, Your Honor, although this wasn't

22 additionally put in our motion, plaintiffs did disclose late

23 certain photographs that were taken by plaintiff of the

24 incident location and to the extent that the court is inclined

25 to grant discovery extension.  This office would also like to

1  question plaintiff of those photographs which were turned over

2  after plaintiff's deposition.

3         THE COURT:  When were these photographs taken, do

4  you know?

5         MR. BERGMAN:  Your Honor, I'm not entirely certain.

6  It was sometime around the incident date, but I do not believe

7  that they were dated and we -- at the deposition itself

8  plaintiff did not indicate when they were taken.

9         THE COURT:  Do you have them?

10        MR. BERGMAN:  We recently received them after the

11  deposition.

12        THE COURT:  What -- they're just photographs of the

13  neighborhood or --

14        MR. BERGMAN:  Your Honor, they're photographs of the

15  incident location and they indicate that there was some

16  construction that was happening at the scene which plaintiff I

17  think is going to allege that -- it seems anyway that

18  plaintiff might allege -- indicate that he did not commit the

19  traffic violations in question, so defendants would like to be

20  able to question about that.

21        Now, again, that was not the reason we initially

22  asked for an extension, but to the extent that we are granted

23  one we would like to ask plaintiff about the photographs.

24  Your Honor, defendant would just note that this last-minute

1 disclosure was the first time that plaintiff has made any

2 allegations in this case that he's receiving damages for any

3 of these injuries.  Although they were referenced in an expert

4 report in April, that expert report does not indicate that any

5 examination that plaintiff has was conducted and just

6 indicated that a CAT scan was taken that showed no injuries,

7 but somehow the expert diagnosed him with a post-concussion

8 syndrome.

9      That said, plaintiffs did not supplement their

10 interrogatory responses at that time to indicate that they

11 received damages with respect to any such injury.

12      THE COURT:  Mr. Harvis.

13      MR. HARVIS:  Thank you, Your Honor.  So what

14 happened here is there was an expert disclosure deadline of

15 April 13, 2018.

16      THE COURT:  Um-hum.

17      MR. HARVIS:  On April 7, 2018 we provided an expert

18 report from Dr. Alvin Guy [ph.].  It was an exhibit to our

19 most recent letter.  And the doctor make a diagnosis in that

20 report.  One of them is post-concussion syndrome.  He noted

21 that it was unclear whether or not the plaintiff lost

22 consciousness, that he hit his head, and all of that was known

23 to them as of April 7, 2018.

24      Then about four months past, which was the period of

25 time all included in discovery they never asked us for a

deposition of the expert, they never asked for plaintiff's

IME, even though Your Honor had asked them whether they were

scheduling it at the last conference in April 11th.  Your

Honor asked them if they were scheduling it.  There was no

indication that any report was in progress or that an expert

had been retained.

Then they had a deadline to make their report of

August 3rd and they found out or they realized that they had

their own significant problem with late disclosure of the

identity of a witness that would --

THE COURT:  Put that aside.

MR. HARVIS:  But I'm just -- but I just want to

point out that the reason why on April 27th they filed a

letter to Your Honor saying that they needed this extension

was purely tactical.  What they were trying to do was to

get --

THE COURT:  Put that aside.

MR. HARVIS:  Okay.  What I -- on the merits what I

would say is we -- as the deadline required we produced

complete expert disclosures from a qualified expert who

reviewed the records and made a series of diagnoses.  They're

now standing up and saying they had no notice about a post-

concussive syndrome when it was in our report on April 7th.

It's just an enumerated diagnosis.

And so -- and then by the way, Your Honor, we have a

1   deposition transcript so then plaintiff was deposed.  And the

2   first series of questions that he's asked he indicates -- and

3   this was -- oh, and by the way, I should also mention, so they

4   were pressuring us to try to settle the case in April of 2018

5   and the court just culminated in a letter to Your Honor in

6   July.  And basically, you know, there had been settlement

7   discussions and then we said to them in the best of faith in

8   April we said -- and they don't deny this; it's in their

9   letter -- they said -- they said, "We want you to get back

10  with that settlement," and we said, "Hold on a second.  He's

11  having further symptoms and we want to have him checked out by

12  another doctor.  We want to do further imaging.  We want to

13  see if the bulge in his back has gotten worse and we want to

14  see what's going on with his head."

15          So we didn't -- we stepped -- took a step back from

16  settlement and they -- a bunch of emails were exchanged, "Hey,

17  when are you getting examined?" and we kept him in the loop.

18  We were completely candid about it.  It took a little while to

19  figure out which doctor he should go to.  He ultimately made

20  an appointment.  He went to the doctor.  They knew that.  He

21  then sits down for his deposition, answers all the questions

22  about them.  He testifies about hitting his head.  He

23  testifies about post-concussion syndrome, headaches,

24  blurriness, all of that stuff.  Just completely discloses it.

25  Talks about the doctors and everything.

1       And then they actually never even asked us for those

2  releases afterwards and I think again that was tactical.  They

3  try to tee up this dispute as if it's like a late disclosure

4  when all we're trying to do -- and this is also, if I may --

5  sorry for talking so fast.  In November of 2017 we went out of

6  our way to give them every release for every provider that we

7  could possibly know of that ever treated this person going

8  back ten years before the incident to the present so they

9  would have his medical history in its totality from when he

10 was 13 years old.  So we thought that that would sort of make

11 sure that they knew what was going on with his medical

12 treatment.

13       Then we timely get this expert report done.

14 Everyone knows he's hit his head and he talks about post-

15 concussive syndrome and I'm just really not sure what it is

16 that -- I mean, other than trying to get them to release it a

17 few days earlier, which I wish --

18       THE COURT:  Do you have this -- I -- the Rule 26(e)

19 supplemental disclosure that was emailed at 8:48 p.m. on

20 July 26th?

21       MR. HARVIS:  If it was in the exhibit to their

22 letter, then I don't think I do have it.  They may have it.

23       MR. BERGMAN:  Your Honor, we have a copy of that.

24       THE COURT:  Could I see it, please?

25            [Pause in the proceedings.]

1      Okay.  So you're saying, Mr. Harvis, that everything

2 that's in this Rule 26(e) supplemental disclosure had been

3 raised previously?

4      MR. HARVIS:  Well, here's what I'm saying.  What I'm

5 saying is that we were completely candid about what was

6 happening, that we had an expert report deadline which we

7 complied with and told them everything we knew at that point.

8 Then he's additionally symptomatic and he goes to additional

9 treaters.  And based on what we learn from those treaters --

10      THE COURT:  So then you have no objection to

11 extending discovery, even though you've opposed it --

12      MR. HARVIS:  I don't want to --

13      THE COURT:  -- for them to go into these additional

14 injuries, which that's your words, not mine.

15      MR. HARVIS:  If I may just -- Your Honor, and just

16 so -- first of all, I consented to their request.  If you look

17 anywhere in those letters we always consented to the request

18 for more time.  And this really brings me back to -- it's in

19 their letter, it's in our letter.  This is really what I want

20 to get at, Your Honor, though, because this is really the

21 heart of the whole --

22      THE COURT:  Oh, no.

23      MR. HARVIS:  Oh.

24      THE COURT:  Don't -- just answer the question, okay?

25      MR. HARVIS:  I don't --

1    THE COURT:  Go -- all right, so then -- let me see

2 this.

3                    [Pause in the proceedings.]

4    So you will -- you have no objection.  You got your

5 additional 45 days.  That's what you've asked for.  But just

6 tell me in -- and you -- you do whatever you need to do to get

7 into all this in that 45 days.  If you need to re-depose him,

8 send him to another doctor, all that, but that's not a lot of

9 time to do it.  So better start tomorrow.

10    MR. BERGMAN:  Thank you, Your Honor.

11    THE COURT:  Since when prior to this was there any

12 indication in the record that he had post-traumatic stress

13 disorder?

14    MR. HARVIS:  I have to look at Dr. Guy's report.

15 I'm not clear if it's in there.

16    THE COURT:  Do you have Dr. Guy's report?

17    MR. HARVIS:  I have it.

18    MR. BERGMAN:  Your Honor, I do and I do not believe

19 that it's in there.

20    MR. HARVIS:  It may not be.

21    THE COURT:  Then that's out of the case.  You had a

22 date, an expert date, and you can't go beyond that.  Anything

23 that is not explicitly in Dr. Guy's report, which was the only

24 expert you identified at that point --

25    MR. HARVIS:  Right.

1    THE COURT:  -- by the deadline, if it's not in

2  there -- I mean, Mr. Bergman, you can go into it if you want

3  in discovery, but it's not coming in the case.

4    MR. BERGMAN:  Thank you, Your Honor.

5    THE COURT:  Deadlines are deadlines.

6    MR. BERGMAN:  Yes, Your Honor.

7    THE COURT:  I have no request for an extension, so

8  it's out.

9    All right.  Anything else from your motion that we

10  need to get into?

11    MR. BERGMAN:  Well, Your Honor, just to be clear the

12  45 days also an extension or is there a corresponding 45-day

13  extension with respect to the expert deadline or is it just to

14  get the documents and re-examine plaintiff?

15    THE COURT:  I'm going to look at our current

16  schedule because I don't keep every deadline in every case in

17  my memory.  It's impossible.

18    MR. BERGMAN:  That's quite fair, Your Honor.

19    THE COURT:  All right.  What -- Miriam, can you

20  point me to the docket sheet where our current schedule is?

21  Never mind.  All right.

22    So in your request you said you wanted 45-day

23  extension of discovery to permit discovery defendants to

24  process those releases, review the corresponding medical

25  records and reopen plaintiff's deposition and a corresponding

extension of the expert discovery deadline.  So you have not

produced your expert report yet?

        MR. BERGMAN:  Correct, Your Honor.

        THE COURT:  All right.  You want 45 days and then

another 45 days?

        MR. BERGMAN:  Your Honor, at this time given that we

don't know what the medical documents that we received

indicate, we're not sure whether we're going to get an expert

but we would like the opportunity to get one should we deem it

necessary based on the documents that we receive.  It's hard

for us to say at this point that we need or don't need one

given that we don't actually know what the documents are going

to indicate.

        THE COURT:  Okay.  All right.  Here's what we're

going to do.  All right.  Slightly -- I will give you until

September 26 to do the -- I'll call it fact discovery related

to this supplemental disclosure to get, you know, the medical

records, re-depose Mr. Rodriguez, what have you.  Did I say

September --

        MR. BERGMAN:  Thank you, Your Honor.  26th.

        THE COURT:  26th.  Okay.  And then you will have

until November 9th to do the expert discovery related to that

and everything else.  If that includes sending him to whomever

for reevaluation or whatever in light of the documents you

get, so be it, but you have to do that and get that report

1  out.

2        MR. BERGMAN:  Thank you, Your Honor.

3        THE COURT:  By November 9th.

4        MR. HARVIS:  May I just place my objection on the

5  record, Your Honor?

6        THE COURT:  Why?

7        MR. HARVIS:  Well, because they had a deadline of

8  August 3rd that they never asked for an extension for their

9  expert discovery.  There's no indication they even made any

10 effort to comply with it and plaintiff made timely disclosures

11 as his treatment indicated, a worsening of his symptoms within

12 the deadline in a way that was completely above board and

13 responsible as --

14       THE COURT:  But they asked for an extension on

15 July 27.  Their expert report wasn't due until August 3rd,

16 so --

17       MR. HARVIS:  Well, they weren't asking -- I

18 didn't -- I don't know if they asked for the extension of the

19 expert -- their own expert deadline if that was in there or

20 not.  I just thought it was more time to the discovery, but

21 the objection is more to the preclusion, Your Honor.

22       THE COURT:  No, and a corresponding extension of the

23 expert discovery deadlines, so --

24       MR. HARVIS:  Okay.  Well, may I -- if I may, Your

25 Honor, then just to the extent that plaintiff is being

precluded from presenting the jury with evidence of injuries
that were not diagnosed until after the expert discovery
deadline had passed, that he let defendants know immediately
upon his need for further treatment, that he was going to be
treated, that he immed -- that they had the opportunity to and
did question him about it at his deposition, that we then
promptly supplemented them with releases for those records.
When they contacted us the morning of their motion we
suggested a number of ways that we could resolve it within the
existing deadline and they didn't have any interest in meeting
and conferring.  They just wanted to file a letter to Your
Honor.  And now we've been precluded.  A person has a TBI when
they caused it will not be permitted to present it to a jury
because --

        THE COURT:  But didn't Dr. Guy said he had a TBI?

        MR. HARVIS:  Dr. Guy did not say he had a TBI.  He
did not have the symptoms that allowed him to be diagnosed for
a TBI or they did --

        THE COURT:  When did Dr. Guy examine him?

        MR. HARVIS:  In April of 2018.

        THE COURT:  When was the accident?

        MR. HARVIS:  August of 2015.

        THE COURT:  I just went through a five-week trial
about traumatic brain injuries.  Plaintiff was spectacularly
unsuccessful in that regard.  A TBI does not take years to

1  reveal itself.

2         MR. HARVIS:  I just think it's -- I just think

3  that --

4         THE COURT:  If Dr. Guy didn't diagnose it, couldn't

5  diagnose it, he doesn't have it.

6         MR. HARVIS:  I just want to note our objection, Your

7  Honor.  I just want to say that I think that that question

8  should be for the jury under these circumstances --

9         THE COURT:  Did you send --

10        MR. HARVIS:  -- [indiscernible] --

11        THE COURT:  Has he gone -- do you have any other --

12  who --

13        MR. HARVIS:  Yes.  We provided them with -- it's in

14  there.  We provided them with a report indicating a suspected

15  TBI from a very well respected doctor.

16        THE COURT:  It's in this?

17        MR. HARVIS:  It's in there.  It should be there.  I

18  mean, if that's everything we gave them that was in there,

19  maybe at the end.

20        MR. BERGMAN:  Your Honor, I believe it's one of the

21  last two or three pages.

22        THE COURT:  And is it Dr. Plotnick [ph.]?

23        MS. FETT:  Dr. Golzack [ph.], Your Honor.

24        MR. BERGMAN:  Your Honor, I believe it's a letter

25  from Dr. Golzack to Dr. Plotnick.

1          THE COURT:  Oh, I'm sorry.

2          MR. HARVIS:  And, Your Honor, if I just may say, I

3  mean, we're talking about an indigent person who isn't in a

4  position to -- he doesn't have health insurance.  He hasn't --

5  he didn't work after the accident, so he had no way to get

6  treatment.  And, you know, when Barry and I -- when Ms. Fett

7  and I met him, we didn't quite know what was going on with

8  him.  You know, we didn't know if it was a personality

9  situation --

10          THE COURT:  Okay.

11          MR. HARVIS:  I just want Your Honor --

12          THE COURT:  Time out, time out.  You don't have

13  someone that's diagnosed him with a TBI.  You have someone

14  that says "rule out TBI."  Big difference.

15          MR. HARVIS:  Well, we just have the obligation to

16  supplement under the Rules and so as --

17          THE COURT:  Yeah, but you don't have an opportunity

18  to extend expert discovery *ad infinitum* until you can find a

19  document to say he's got these six additional problems.  You

20  had a deadline.  You didn't satisfy it, you want to extend it.

21  You didn't ask to extend it.  Showing a report that says, he

22  needs further evaluation to determine whether he has a

23  traumatic brain injury is insufficient, so no.

24          MR. HARVIS:  But the thing I don't understand about

25  Your Honor's ruling is that if they're getting this 100 --

1  this 90 more days to do discovery on things that we're not

2  going to be allowed to present to the jury anyway and they had

3  this -- it just strikes me as unfair given the way the parties

4  have behaved in the litigation.

5        THE COURT: They're -- your supplemental disclosure

6  says additional and ongoing injuries and treatment. All

7  right. Additional means there's new stuff that we didn't know

8  about by the date we were supposed to tell you about it.

9  That's out. It's up to them whether they want to hire experts

10  just in case Judge Gershon disagrees with me to deal with

11  that, TBI, post-traumatic stress disorder, anything that

12  Dr. Guy did not mention. All right.

13        MR. HARVIS: Even though we didn't have the benefit

14  of the recorded interview where he talks about hitting his

15  head, that that was made the day of the incident and --

16        THE COURT: He doesn't know if he hit his head?

17        MR. HARVIS: It would have been helpful for his

18  law -- he didn't even know if we had that recorded interview,

19  he was so out of it.

20        THE COURT: Whether he had the recorded interview or

21  not, he doesn't know whether he hit his head, he couldn't --

22  he couldn't describe to Dr. Guy what he went through and

23  Dr. Guy couldn't say, okay, I need to do these tests or refer

24  you to these people with enough time to get expert reports two

25  years after the accident and say he's got X, Y and Z? He

1  couldn't do that with your help?

2        MR. HARVIS: Well, we -- I just wanted to place my

3  objection, Your Honor --

4        THE COURT: Okay.

5        MR. HARVIS: I respect Your Honor's ruling.

6        THE COURT: So additional injuries, you could --

7  I -- well, Judge Gershon may disagree with me so you may want

8  to do expert discovery on that. Get all the records. Send

9  them to a TBI specialist, a post-traumatic stress disorder

10  specialist.

11        But anything that is not in Dr. Guy's report, which

12  is the only report that was submitted by the deadline I'm

13  ruling -- I'm saying is out. Okay. But you need to cover

14  your bases.

15        MR. BERGMAN: Understood, Your Honor.

16        THE COURT: Ongoing injuries, though, that's fair

17  game, right? Dr. Guy said he's got this, that, the other

18  thing, treatment continued on those things. I guess that's in

19  here, right? You've got to deal with that.

20        MR. BERGMAN: Yeah, Your Honor. Truthfully, we're

21  not sure because we don't know who those doctors are, the

22  treatment provided, but that --

23        THE COURT: A lot of them.

24        MR. BERGMAN: -- was why we asked for the extension.

25        THE COURT: Okay. So all of this -- all of these

1  doctors, Mark McMann [ph.], Dynasty Medical Care,

2  Comprehensive Spine and Pain Center of New York -- that sounds

3  familiar -- Merdad Golzad [ph.], June Lim [ph.], Stanley

4  Friedman [ph.], the list goes on and on.  Those are people and

5  facilities that he went to subsequent to Dr. Guy?

6            MR. HARVIS:  Right.  What happened was -- well --

7            MS. FETT:  I'm sorry.  Let me just clarify.  So the

8  first four on that list, I think it's the first four, those

9  are treaters that he saw subsequent.  And then the rest of

10  that list is just a summary of everything they've already been

11  given and releases they've already been given.

12            THE COURT:  So the first four are the additional.

13            MR. HARVIS:  These are treaters.

14            THE COURT:  All right.  Do you understand what --

15            MR. BERGMAN:  Yes, Your Honor.

16            THE COURT:  -- what I've said?  You understand.  I

17  know you disagree with it --

18            MR. HARVIS:  I do.

19            THE COURT:  -- but do you understand?  All right.

20  Okay.  So that should be it with respect to the defendant's

21  motion.

22            MR. HARVIS:  Thank you, Your Honor.

23            THE COURT:  Okay.  Now, what about -- and since I --

24  before the conference started I threatened with Rule 37 cost

25  shifting.  I'm not going to shift costs in this case because

1   there is a substantial justification for this supplemental

2   disclosure.

3           MR. HARVIS:  Thank you, Your Honor.

4           THE COURT:  Okay.

5           MR. BERGMAN:  Your Honor, and obviously I understand

6   the discussion we're about to have but I just want to raise

7   that with respect to disclosures of photographs that plaintiff

8   had, again this is in -- with respect to our request for

9   extension motion.  I just would ask that the court bear that

10  in mind given the next conversation because Your Honor

11  indicated that this was substantially justified, but it's our

12  position that the failure to provide the photos was not

13  justified.

14          That said, we think that it doesn't warrant

15  sanctions, just the same way that our --

16          THE COURT:  When are the photo -- the photos were

17  taken -- let's talk about the photos.  What are these photos,

18  when were they taken, who took them how are you going to get

19  them into evidence?

20          MR. HARVIS: Sure.  They were taken by plaintiff.

21  They're the same thing you would get from Google street view.

22  If you did the August 2015, you know, date limitation because

23  it's just him taking pictures of construction that in the

24  street that blocked his way.  Because the issue is, they say

25  he was biking the wrong way on a one-way street and he says,

1  no, that street was covered with construction.  I walked

2  through that area and then just make a left turn.  And so he

3  went back and photographed the street.

4          Now, when Ms. Fett and I were talking to him and

5  responding to discovery we just -- I don't think he realized

6  that -- I honestly given the TBI he's out of it and I don't

7  know that he even realized what photographs he'd taken but --

8          THE COURT:  So he took these photographs when?

9          MR. HARVIS:  Back when it happened, after it

10  happened for use in his criminal case of the construction

11  site.

12          THE COURT:  Okay.

13          MR. HARVIS:  And we -- you know, we're asking

14  about -- you know, photographs of his injury, things like

15  that, photographs, videos he has of bystanders, that kind of

16  think and the answer was no, no, no and that's correct.  And

17  then we didn't know, we hadn't had that discussion and we

18  weren't aware until his deposition that he had taken these

19  photographs of the scene.  They asked him if he had any

20  photographs.  He indicated equivocally that he may have.  We

21  then directed him to do a search.  He said -- he came back and

22  said, "I have these photographs of the construction site" and

23  we immediately turned them over to them.  And that was --

24  that's the whole story of the photographs.  And --

1          THE COURT:  Were they used in his criminal case?

2          MR. HARVIS:  No.  The criminal case didn't actually

3   get past the hearing because they discovered the text messages

4   between the offers and they offered it and it was resolved

5   with an ACD at that point.

6          THE COURT:  How much time did he spend locked up?

7          MR. HARVIS:  Twenty-five.

8          THE COURT:  And so he -- and he's pers -- he's

9   persisting in a false arrest claim?

10          MR. HARVIS:  There's no false arrest claim.

11          THE COURT:  So then why are these pictures relevant?

12          MR. HARVIS:  Right.  Well, they -- well, it's a good

13   question.  I mean, and also I'm not -- I mean, reading their

14   demands I think it's a little bit on the cusp of exactly what

15   they were asking for, but I mean, there is -- it comes up when

16   we talk about this witness, which I hope we're going to talk

17   about in a minute.  It goes to at the -- at the beginning of

18   the incident there's -- the police have somebody stopped they

19   claim and that person sees two bicyclists go past him and

20   there's a question as to whether that person -- you know,

21   because it really goes to the force because the question is,

22   were the police pursuing him and him trying to evade them or

23   was he just minding his own business with his headphones and

24   riding on the street having no idea if there's someone behind

25   him.

1    So whether or not he had I guess committed a traffic

2  infraction in the initial intersection is going to be

3  probative of, you know, how much force the officer did use to

4  apprehend him, whether what -- you know, what speed they could

5  be going.  A lot of things I think go to the force.  So I

6  think that question of the initial incident is relevant to

7  what happened later on but, I mean, we're not talking about

8  the most primary relevance possible, but I think that there is

9  a degree of relevance.

10    MR. BERGMAN:  Your Honor, if I may, I -- there's

11  also denial for a trial claim here, so it's real -- it could

12  be potentially relevant to deny a fair trial claim to the

13  extent plaintiff is contending that is purported to have done

14  things that he did not do.

15    Additionally, plaintiff testified at his deposition

16  that he was not actually asked to do a search for these

17  photographs or any photographs.  And our discovery response --

18  or sorry, our discovery request specifically asked to produce

19  all photographs and other audio-visual material documenting

20  incident -- the scene of the incident and all injuries that

21  resulted from the incident, so it was directly proportional to

22  our response and no search was ever done and no request was

23  ever done for a search.

24    MR. HARVIS:  May I respond to that, Your Honor?

25    THE COURT:  Um-hum.

1      MR. HARVIS:  The fair trial claim has to do with the

2  lies that say that he was flailing his arms to resist arrest.

3  It's on surveillance video.  It's not about the initial

4  traffic infraction.  The question is whether they lied and

5  said he was resisting and whether they -- there was a

6  legitimate search of his backpack.  Those are really the

7  Fourth Amendment issues and they all involve that scene of the

8  actual incident where he was struck.

9      I mean, talking about the incident as the initial

10  stop, you know, a block away when he made the left turn I

11  think is a little bit of a stretch from our point of view.

12  And so, you know, we certainly had him -- I don't -- you know,

13  I wasn't -- I don't know what his -- whether or not his

14  deposition testimony seems to be at odds with us or not, but

15  certainly in our initial interview with him we were asking him

16  about photographs.  I mean, there's no question about that.

17      And so I just don't think that -- I don't think he

18  frankly remembered having taken these photographs and since

19  they weren't of his injuries or videos of the actual arrest I

20  don't think we thought to probe about it and that's -- you

21  know, that's what happened.  And then as soon as it was

22  brought up we immediately found them and we immediately sent

23  them over, so that was our ...

24      THE COURT:  So what's your problem with the photos?

25      MR. BERGMAN:  Your Honor, I only raise it because

plaintiff has asked -- actually now asking for sanctions for
similar conduct and we just want to raise that -- well, first
with respect to the purpose of the photos with respect to our
case we don't think that it's instrumental to our case which
is why we didn't move for it.  We're raising it now, one,
because to the extent we were able to [indiscernible]
plaintiff we would like to ask him about it, as long as we
have the opportunity to, but also because plaintiff is
essentially asking for sanctions now with unclean hands given
the conduct they committed.

Now, granted, I think the court may be inclined to
say and we understand that the import of the documents
requested may differ to some extent but we just want to
raise --

THE COURT:  That's a big part of the analysis,
right?

MR. BERGMAN:  Yes, Your Honor.  We just wanted to
raise that to the court and make the court aware of that.

THE COURT:  Your Honor, you can ask him questions
about the photos.  It's up to Judge Gershon.  It seemed to me
that they're tangentially relevant at best if not total waste
of time.

MR. BERGMAN:  Yes, Your Honor, which is why --

THE COURT:  But you can ask him questions about it.
They're not precluded.  Go ahead.

 1          MR. HARVIS:  Thank you, Your Honor.

 2          THE COURT:  So that's defendants all done, right --

 3    or all done with your issues, other than not wanting to be

 4    sanctioned.

 5          MR. BERGMAN:  Yes, Your Honor, and the remedies that

 6    we suggested there and our response of sanctions motion.

 7          THE COURT:  Okay.  All right.  Close this.  Close

 8    that.  So, Mr. Harvis, why should I sanction them?

 9          MR. HARVIS:  Well, Your Honor, we believe that this

10    case in many ways is almost identical to the <u>Brown</u> case where

11    Your Honor imposed sanctions less than --

12          THE COURT:  Why do lawyers do that?  Why do they try

13    to grab onto something that a judge did in another case and

14    say, yeah, me too?

15          MR. HARVIS:  Well, I mean I just -- I think Your

16    Honor -- just think Your Honor is familiar with and that way I

17    could sort of like, you know, provide some similar -- some

18    similarities here.  I mean, on some ways -- in some ways I

19    think it's less egregious conduct in the sense that, you know,

20    the record in terms of the pursuit of the document perhaps

21    isn't as egregious as it was in the <u>Brown</u> case, although

22    there's no question that they were subject to -- that

23    plaintiff's recorded interview and the identity and interview

24    of this witness were subject to mandatory disclosure under

25    Rule 26 and we're specifically requesting our Rule 34 request.

1    And unlike the plaintiff who's never been the
2  subject of a motion to compel in this case, the defendants
3  were the subject of a motion that included a request for the
4  hospital recording.  The only reason we asked for the second
5  hospital interview and not the first hospital interview is
6  because the memorandum that allowed us to know of the
7  existence of these interviews doesn't make it explicitly
8  clear.
9       THE COURT:  Break it down beginning to end so it's
10 clear for the record.
11      MR. HARVIS:  Sure.  So plaintiff has this incident.
12 He's hurt.  He's not taken to the hospital.  He's taken to the
13 precinct.  At the precinct he's there for a period of time,
14 about a half an hour to an hour.  He then gets taken to
15 Elmhurst Hospital.  While he's in the waiting room he's
16 approached by these guys named Kivlin [ph.] and another fellow
17 and they're with the Queens North Investigations Bureau.  Not
18 IAB but the Bureau Level Investigations Unit.  And they speak
19 to Mr. Rodriguez.  There's an eight-minute exchange.  She
20 talks about the facts of this case, the other bicyclists, the
21 fact that he's struck by the vehicle, the fact that he hits
22 his head and I put some of the text of that in one of our
23 letters there and it's basically in a detailed exchange about
24 his questions and his injuries at that time.
25      And then another hour passes and Captain Forgione

1  [ph.], who's the commanding officer of the precinct, the 110th

2  Precinct, goes and visits and he says --

3          THE COURT:  Not commanding officer of the first two?

4          MR. HARVIS:  I don't know.  I don't know.  I think

5  they're from different commands.  The first two are from

6  this -- this Bureau-wide thing and now he's from the 110th

7  Precinct.  He's the commanding officer.  And he goes and he

8  says something along the lines of "I know you told these other

9  guys what happened, but I need you to tell me.  I'm trying to

10 investigate if something happened here.  I need you to tell

11 me" and Mister -- and again, there's been no Miranda.  And

12 Mr. Rodriguez says, "I don't have my Legal Aid.  I don't

13 really feel comfortable.  I don't want to do it," and so

14 basically both interviews are recorded, the first and the

15 second one.

16          THE COURT:  Audio?

17          MR. HARVIS:  Audio recording.  He has no idea.  In

18 fact, when he was deposed, because we didn't know about it at

19 that time, when he was deposed they said to him, you know,

20 "What happened at the hospital?" and he comes out that he's

21 speaking to these people and he didn't even know that the

22 first interview was recorded.  He thought only the second

23 interview where he declined to speak to them was recorded.  I

24 think that speaks to his mental state, but anyway.

25          So then -- then there's also -- just for the

1 purposes of the record there's also an attempt to interview

2 him again at central booking, which I believe is actually by

3 Internal Affairs.  Again he invokes his right to counsel.  He

4 says, "I don't want to speak."  And then I should also

5 mention --

6          THE COURT:  Recorded?

7          MR. HARVIS:  It was also recorded, yes.

8          THE COURT:  Three recorded interviews.

9          MR. HARVIS:  Correct.

10          THE COURT:  Okay.

11          MR. HARVIS:  And so --

12          THE COURT:  And asked for all statements,

13 recordings, everything from the plaintiff.

14          MR. HARVIS:  Exactly.

15          THE COURT:  And what did they produce?

16          MR. HARVIS:  So -- well, initially they produced

17 nothing with their discovery responses.  And then they said,

18 "We're going to produce the CCRB file soon."  And I -- before

19 I get there I just want to also for the purpose of the record

20 say before the officers wanted to pursue the plaintiff they

21 were giving a summons to a person by name of Leonardo Flores

22 [ph.].  Flores while plaintiff is at the hospital being

23 interviewed by Forgione -- or I should say actually a little

24 bit afterwards, but while plaintiff is still at the hospital

25 but they've come back to the precinct, the investigators, they

bring this guy Leonardo Flores who they had been summonsing at the scene to the precinct. And his daughter sits there and she translates an interview about what happened. It's not long. It's only a few minutes long and it's -- you know, I mean, it's in the eye of the beholder what the purpose was or in the minds of the investigators but, you know, they basically lead him to get some answers that would suggest that the plaintiff may have heard a command not to stop. They don't probe it but they just -- it's mentioned and it's sort of ambiguous the way he answers.

And so -- and then, by the way, this is sort of an aside, but then they void his summons, even though he admits in his recorded interview to having committed the traffic infraction, so --

THE COURT: It for Flores's --

MR. HARVIS: Correct. And we don't --

THE COURT: Because Flores says that Rodriguez may have heard the command not to stop.

MR. HARVIS: Yeah. And I don't even want to make it seem like it's that clear. It's really more ambiguous than that but, yes, he indicates that somebody was told to stop and that the police then basically went after them. That's all it is. And then -- and I'm kind of skipping around a little bit just for clarity, I think. I want to explain ultimately this guy --

1          THE COURT:  Flores is not going to be testifying in

2  this case.  You know that, right?

3          MR. HARVIS:  Well, I'm -- that's our application.

4          THE COURT:  How would Judge Gershon allow him to

5  testify?  Yeah, that guy heard the command to stop.  How --

6  come on.

7          MR. HARVIS:  I don't know.  I don't know.

8          MR. BERGMAN:  Your Honor, he could potentially

9  testify to the fact that he saw plaintiff get a traffic

10  violation and then go away from the officers when there's

11  additional bicyclists ahead of him.

12          THE COURT:  Did he say that?  You didn't get -- you

13  didn't get Flores's statement.

14          MR. HARVIS:  If I may, I just -- let me just put --

15  lay out a little bit more.

16          So then they interview Flores with his daughter.

17  They let him go.  Plaintiff is at the hospital making his way

18  to central booking and at that moment -- I believe it's about

19  6:00 o'clock in the morning the next day -- Captain Forgione

20  sits down and he write a memo.  And in the memo he says, a

21  witness known to the department has said that plaintiff -- I

22  mean, I'm summarizing, plaintiff actively evaded arrest which

23  is in contrast to what the plaintiff says, which is that he

24  was just writing along innocently and got struck.

25          So therefore, the plaintiff is not credible and

basically that sets it up for this whole thing to be like exonerated down the line. Because Forgione credits this unnamed witness as basically discrediting the plaintiff, the investigation goes along a track of the plaintiff is lying, this didn't happen that way and it basically sets in -- we believe it set in motion the outcome of the investigation which, you know, seems to have substantiated the officers, although -- excuse me, unsubstantiated, although there are some records actually that indicate at some point it was substantiated, which we don't totally know the answer to that issue.

So there's a memo. And in the memo we have the unnamed witness, okay, who's a civilian and we don't know anything about where he was or what he saw and then we have obviously these recorded interviews of plaintiff. They serve their discovery responses which, you know, we specifically asked for any audio recorded interviews, any civilian witnesses, you know, everything that you would expect that we would ask for.

And they come back and they say, well, we're going to give you the CCRB files soon. That's basically what they say. And they also disclose one civilian witness whose name is Manuel Ceballos [ph.], who is the fellow whose parked car was hit by plaintiff as he flew onto the pavement. So they disclose him.

1      So all we have is a memo that says an unknown -- a

2  witness who's known to the department and then Manuel Ceballos

3  is given to us.  And there's an interview of Manuel Ceballos

4  that has -- that was produced at some point.

5      THE COURT:  You have a witness unknown to the

6  department, Mr. Ceballos and three --

7      MR. HARVIS:  Interviews.

8      THE COURT:  -- recorded audio-taped interviews.

9      MR. HARVIS:  Right.

10     THE COURT:  That -- and -- but, no, you don't have

11  the three recorded interviews?

12     MR. HARVIS:  Right.  When we first get the CCRB file

13  my understanding is we don't -- do we have any recorded -- I

14  don't believe that there are any recorded interviews produced

15  at the CCRB.  I think it was just the paper file.  But I can

16  assure you, no matter what was produced, we did not ever get

17  that first hospital interview and the CCRB file does not

18  identify Flores.

19     THE COURT:  First hospital interview with the two

20  dudes from --

21     MR. HARVIS:  The Investigation Bureau.

22     THE COURT:  Okay.

23     MR. HARVIS:  Who give him a -- do a nine-minute

24  talk.  Didn't get that.  It wasn't disclosed that it existed.

25  We didn't get it and we also -- the CCRB file doesn't mention

Flores or his -- the fact that he had a recorded interview. You wouldn't know that from reading the file.

Then -- and then there's no further disclosure about it at all that's relevant to this.  I mean, we ultimately do get from Your Honor's order in April, we -- you know, which they get extended and they finally produce it like the day before plaintiff's deposition and that was, I think, July 17th.  And at that point now we have the second hospital interview with Forgione where he says, "I don't want to talk to you."  And he has -- and we have the IAB interview at Central Booking where he says, "I don't want to talk to you" and that's it.  We still don't know about Flores.  We still don't have Flores's interview.

THE COURT:  And -- all right.  So at that point you have all three recorded interviews?

MR. HARVIS:  No, we only have two of them.

THE COURT:  The sec --

MR. HARVIS:  [Indiscernible] doesn't say anything.

THE COURT:  The second and the third and you don't have the first.

MR. HARVIS:  Right.  And then plaintiff is deposed. And as I mentioned, he testified that he didn't even know the first interview was recorded.  Obviously he's not given a copy.  He's not given any paper or anything.  He has no idea. And so then we're preparing for the officer depositions and

[indiscernible] CCRB audio and in the CCRB audio the driver of the police car, Zeng [ph.], one of the defendants, says to the CCRB investigator, "Oh, yeah," and sort of -- you know, it's not a long interview and he sort of says, "Oh, well, yes.  I was giving someone a summons.  He saw everything and he testified to the interviewers that night for me."  That's what he says.  He testified, "That night the investigators interviewed -- investigators for me."

So then we email the City.  That's what Zeng is saying, that that --

THE COURT:  He said what?  He testified -- "he" meaning Flores.

MR. HARVIS:  Correct.

THE COURT:  Testified for the inter -- who were the interviewers?

MR. HARVIS:  Well, we don't know from what Zeng said but now I believe it was Kivlin and whoever was interviewing him.

THE COURT:  That --

MR. HARVIS:  On behalf -- in Zeng -- in support of Zeng's narrative.

THE COURT:  Are these the same -- these are not the same people who interviewed -- who initially interviewed your client.

MR. HARVIS:  I think they are.

1    THE COURT:  They are.

2    MR. HARVIS:  I think what happens is basically there

3 at the hospital they come back to the precinct and they bring

4 Flores in.

5    THE COURT:  I see.

6    MR. HARVIS:  Okay.  And then I think it's -- at that

7 point I think it's Forgione, Kivlin and the other -- all three

8 of them interviewing Flores.  And so basically we say to them,

9 okay, we have Zeng's recorded interview saying that this non-

10 party saw everything and was interviewed that night.  Who is

11 he?  We don't think he's Manuel Ceballos because we have a

12 recorded interview from Manuel Ceballos.  I think it's in

13 Spanish, but we were able to figure out what it said and it

14 basically says he didn't see anything and he's the guy who

15 owns the parked car.  So there's way that that could be the

16 person Zeng is saying he saw everything.  So we raised it with

17 them.

18    And then a day or two passes and then we hear back

19 from him and they said, "Oh, wait.  Okay.  The guy, his name

20 is Leonardo Flores.  We're going to get you his address.  Oh,

21 by the way, he has a recorded interview.  Here it is.  And by

22 the way, there's a recorded interview of plaintiff at the

23 hospital.  I'm going to give that to you, too."

24    So now plaintiff has been deposed.  It's two days

25 before the close of fact discovery and we're provided with the

1 Flores -- identity of Leonardo Flores but initially now his

2 address, although we did get that subsequently and his

3 recorded interview and the fact -- and the recording of the

4 plaintiff --

5 THE COURT: What did Flores say in his recorded

6 interview?

7 MR. HARVIS: He said, "I was standing there with the

8 officers. Two -- while we were standing there two bicyclists

9 go by. They didn't stop" and I'm not -- you know, I can't say

10 it verbatim, but something along the lines of "They didn't

11 stop and then the officers went after them."

12 THE COURT: The officers then had stopped him?

13 MR. HARVIS: Correct. Go after the --

14 THE COURT: Flores was on a bicycle also or --

15 MR. HARVIS: Yeah, Flores admitted that he was

16 stopped on a bicycle and had just like run a stop sign.

17 THE COURT: Okay.

18 MR. HARVIS: And that they went after him and came

19 back later and handed him a summons.

20 And what the off -- the investigators were focused

21 on, which I think is -- makes sense was whether or not Flores

22 saw damage to the passenger side of their vehicle because this

23 is about whether or not they hit plaintiff's car. That's what

24 the investigators are thinking about. So they're asking

25 questions like that and he basically says, "No, I didn't see

1  any damage."

2      THE COURT:  So all Flores can offer is that he saw

3  plaintiff ride by him on a bicycle and the officers took off

4  after him?

5      MR. HARVIS:  I mean, honestly I don't know because I

6  never had the opportunity to question him.  He was only asked

7  a few questions.

8      THE COURT:  Well, you have his interview, his

9  recorded interview.

10     MR. HARVIS:  We do have that.

11     THE COURT:  So all he said in his recorded interview

12 is, they're giving me a summons, they stop me, they're in the

13 process of giving me a summons, these two dudes on bicycles

14 drive by, they go after him, they then come back and give me

15 my summons.

16     MR. HARVIS:  Right.  But this is -- this is -- it is

17 this testimony that Forgione in his memo says -- contradicts

18 plaintiff and says that the witness says the plaintiff was

19 actively evading arrest, so --

20     THE COURT:  But the witness doesn't say that.

21     MR. HARVIS:  Correct.

22     THE COURT:  All right.

23     MR. HARVIS:  But he might if we asked him.  I don't

24 know what he would say.  You know, I don't know what wasn't

25 recorded.  I -- we haven't spoken to him.

1          MR. BERGMAN:  Your Honor, if I may --

2          THE COURT:  No.  Not yet.

3          MR. BERGMAN:  I just wanted to --

4          THE COURT:  You'll have plenty of time to respond.

5          MR. BERGMAN:  It was just clarifying a point about

6    the interview.  I think he said that one of the people did

7    stop and pointed to -- and another individual did not --

8          THE COURT:  Okay.

9          MR. BERGMAN:  -- just for the --

10          THE COURT:  All right.  All right.

11          MR. HARVIS:  He's not asked a lot of questions in

12   this, just maybe, I don't know, ten questions that he's asked.

13   It's four minutes long.  And according to Zeng, though --

14          THE COURT:  So you get then -- you get Flores' name.

15   You later get his address and then you get -- well, when you

16   get his name do you get the recording?

17          MR. HARVIS:  Yes.

18          THE COURT:  All right.  You get the name of the

19   recording, later get the address.  When you get the name of

20   the recording you also get plaintiff's first recorded

21   interview?

22          MR. HARVIS:  Around -- happened -- this is within a

23   span of hours, yes.

24          THE COURT:  What is different, if anything, from the

plaintiff's recorded first interview and what he said at his deposition?

MR. HARVIS: Well, so in his first interview he talks about the -- well, it's not so much I -- it's not so much that I want to say that there are specific instances that I can pinpoint. I mean, I think that it will come out in cross-examination but, you know, it's basically the same -- he's giving the same description of the same events an hour after they happened or whatever, a couple of hours afterwards.

THE COURT: That is hugely different than <u>Brown</u>.

MR. HARVIS: Okay.

THE COURT: And that was the whole purpose of the sanction in <u>Brown</u> is the plaintiff was asking for his recorded interviews from Jump Street.

MR. HARVIS: Right. That's the same.

THE COURT: And Mr. Shantee [ph.] didn't do his job, didn't get them. There was a summary and that's -- and if -- this incident happened long ago so the plaintiff whose recollection wasn't perfect because he had a head injury.

MR. HARVIS: Same situation.

THE COURT: Right? The summary is different. He testifies sort of like the summary, but the summary was wrong based on the recorded interview.

MR. HARVIS: Right.

THE COURT: And he didn't have the benefit of that,

1    so there were marked discrepancies between his deposition

2    testimony and his recorded interview and that was the problem.

3            Here if there's really no difference between the

4    recorded interview and what he said at his deposition, no

5    harm/no foul.  And if you can't point me to anything, I'm not

6    going to sanction them for it.  While they should have

7    produced it from the beginning there's no prejudice to your

8    client.

9            MR. BERGMAN:  He had to be deposed about the

10   incident without the benefit of his recording --

11           THE COURT:  But if he --

12           MR. HARVIS:  Of course they didn't

13   [indiscernible] --

14           THE COURT:  -- didn't testify differently about the

15   incident in his recorded interview and his deposition there's

16   no prejudice.

17           MR. HARVIS:  Well, I don't have the benefit of the

18   transcript because we only got it last week, the recording.

19   So I don't want to say that, Your Honor, because I'm quite

20   sure at trial they're going to be arguing that there are a lot

21   of differences because that's --

22           THE COURT:  Lawyers always argue that.

23           MR. HARVIS:  Of course.

24           THE COURT:  But unless there are -- unless there

25   are -- unless you can point me to real differences that are

1   prejudicial, not, you know, what color shirt were you wearing;

2   oh, I was wearing a red shirt; no, I was wearing a blue shirt.

3   You know, if you can point me to something that's real that

4   prejudices him from not having the recorded interview prior to

5   his deposition I'll listen to your complaint.

6          If you can't, then there's no prejudice and that --

7   that's the heart of the <u>Brown</u> decision.

8          MR. HARVIS:  Right, but the prejudice, Your Honor,

9   is that now they have the opportunity to -- even if it's not

10  different, which I think it is and I think if I have the

11  opportunity to get the transcript and to look at it I'm

12  certain that there are going to be differences because he just

13  testified at length about it here and then, you know, just --

14  it's just going to be the case.

15         But even if there aren't differences and they're

16  just allowed to come in at trial and talk about the fact or

17  present to the jury that they believed that there are

18  differences or anything like them, I mean, that's the most

19  profound kind of prejudice he could have.  He -- the whole

20  idea of the rules --

21         THE COURT:  Yeah, but they would be able to argue

22  that even if he had the transcript before.  No one testifies

23  exactly the same.

24         MR. HARVIS:  But we need a fair opportunity to meet

25  it and to be prepared for it.

1        THE COURT:  Mr. Harvis, look at the transcript.  If
2    there's anything meaningfully different, come back.  If
3    there's not, you know --
4        MR. HARVIS:  Well, at the very least, Your Honor, I
5    mean, we would think that they should be precluded from --
6        THE COURT:  No.
7        MR. HARVIS:  From --
8        THE COURT:  No.
9        MR. HARVIS:  Flores as a witness when we never had
10   the opportunity to even speak to the person?
11       THE COURT:  What did Flores -- what -- all right.
12   There has to be prejudice.  Flores said, "I'm stopped.
13   They've given me a summons.  If two guys go down the street on
14   their bikes, they take off after him, they come back and give
15   me a summons."  That's not different than what your client is
16   claiming.
17       MR. HARVIS:  Yes, it is.
18       THE COURT:  I was riding down the street and they
19   bumped me off the road.
20       MR. HARVIS:  Flores's statements can be interpreted
21   as -- and the police did interpret them and they're going to
22   get on the stand.
23       THE COURT:  Whatever Forgione misinterpreted that
24   may not come in.  That -- Forgione's memo that says Flores
25   said X, hearsay.  All right.

1      MR. HARVIS:  I just -- how can it be -- how then

2  they call a witness that would never disclosed the plaintiff

3  an opportunity to question then and we don't know what he

4  would say it he was questioned and asked specific questions --

5      THE COURT:  I didn't say you couldn't get an

6  opportunity to question him.

7      MR. HARVIS:  Oh.

8      THE COURT:  You want to take his deposition go right

9  ahead.

10     MR. HARVIS:  Okay.  I mean --

11     THE COURT:  You can do that within 45 days.  But

12 unless -- you know, and shame on you for not disclosing him.

13 I mean, this is becoming a consistent thing with the NYPD.

14 They're -- I could give you multiple examples beyond <u>Brown</u>

15 where things are not disclosed.  So you folks need to have a

16 serious conversation about that.

17     And I mean, that's putting aside the

18 characterization -- mischaracterization of statements --

19 recorded statements that we see on the paperwork.  You know,

20 you need to clean that up, but take his deposition.

21     MR. HARVIS:  Just to contrast, though, Your Honor, I

22 mean, in the case of -- and I don't -- I just -- if I may, I

23 just in the case of the medical issue we have a young man with

24 a TBI who was going to get treatment and the treater is saying

25 that he has an injury and we're disclosing it to them and they

haven't even done any expect discovery yet or weren't even

planning on doing it.  And now they're basically getting a

free chance to do the expert discovery they missed the chance

to do the first time, which is fine, but to contrast that with

us being deprived of a key eyewitness and are plaintiff's own

interview --

THE COURT:  You're not being deprived of a key

eyewitness.  You're getting a chance to take his deposition.

MR. HARVIS:  Okay.  Well, that --

THE COURT:  You want to deprive them of the

opportunity to have a key eyewitness.

MR. HARVIS:  Well, no.  I just -- I do think that

that's warranted under Patterson and Dubalsomico [ph.] and

other cases in the circuit.  I think that there is -- there

should be a penalty for making -- I think there should be a

deterrent -- some reason why the next time it comes up and

they're doing discovery responses they really look to see if

there's civilian witnesses.  I think that that would be like

an appropriate thing to do given what we're seeing in terms of

a pattern.  I don't think it has to be --

THE COURT:  You had indication from -- is it

Sergeant Forgione or --

MR. HARVIS:  Captain.

THE COURT:  Captain Forgione that there was this

civilian -- there's a witness whose identity is known to the

1  department.  You knew that.

2           MR. BERGMAN:  Yes, Your Honor.

3           THE COURT:  Did you ask him -- who is it?

4           MR. BERGMAN:  Did we ask Captain Forgione himself?

5           THE COURT:  Yeah.

6           MR. BERGMAN:  No, Your Honor.  It was -- and this

7  was a misunderstanding.  We believe that it was Ceballos.

8           THE COURT:  All right.  You've got to pay for

9  Mr. Harvis's or Ms. Fett's time taking the deposition --

10          MR. HARVIS:  Thank you, Your Honor.

11          THE COURT:  -- of Mr. Flores.  You should have

12  disclosed him.  A witness is a witness.  Whatever they're

13  going to say, they're going to say.  You have an obligation

14  under -- initial disclosures to do it and certainly when a

15  discovery request is made and the failure to do that should

16  have some -- some -- not to call it sanction.

17          MR. HARVIS:  Consequence.

18          THE COURT:  Consequence.  Thank you.  So they'll pay

19  for your time taking the deposition.

20          MR. HARVIS:  Thank you, Your Honor.

21          THE COURT:  You're not going to be deprived of the

22  opportunity to put him -- you know, to put him up in trial.

23          MR. HARVIS:  Okay.  I just -- before we -- I would

24  just like to take one last opportunity to ask Your Honor given

25  the fact that they're having a full opportunity to take

discovery on the medical issues, to just not -- you know, to just reconsider the ruling that we will be precluded from offering this -- these treatment records where he's completely disclosed the records.

THE COURT: All right. Okay. No. And here's why. You had plenty of time to do it by the deadline that was set and you didn't. And even now you haven't done it because there's no one that says he has a TBI. He says he may have a TBI. Got to rule it out. So what you're -- in essence what you're asking for, that doesn't -- that -- it wouldn't pass Daubert. It wouldn't be allowed to testify about that because they haven't made that diagnosis yet.

So what you actually want is more time to have him examined by a TBI specialist and produce the report that says he has a TBI and that he has PTSD.

MR. HARVIS: Well, for that we would be willing to only put on a treater. We're not asking -- that's why we specifically didn't ask -- we're not ask --

THE COURT: Yeah, but you can't -- you can't put on a treater. They're not allowed to testify to causation unless causation was something that they -- an opinion that they reached during the treatment and it's relevant to the treatment. You're, in essence, asking to elevate that treater to an expert. There is a difference between the two.

MR. HARVIS: Well, we just want -- given the fact

that it's being disclosed on a current basis we just want the

normal process where it goes in through a <u>Daubert</u> process and

if Judge Gershon believes it's appropriate then it should --

then it comes in and just that given the fact that we've acted

in what I would argue very good faith albeit -- I'd love to

have everything --

THE COURT:  It hasn't --

MR. HARVIS:  -- at the beginning of the case.

THE COURT:  It has nothing to do with good faith.

It has to do with timely disclosing experts.  You had plenty

of time.  You could have -- you -- look, I had -- I had a six-

week trial I told you with TBI.  You know what -- all of his

experts, except for maybe one, expert/treating, they played

that game, too.  They provided the services on liens.

Questioned whether that's ethical or not and psychologist

issues, PTSD, that's not according to the American

Psychological Association or Psychiatric Association,

whatever, you're not supposed to treat people with a lien

[ph.], so you could have done that, right, by the deadline.

He's got problem with medical care and all that.  You could

have worked that out but you didn't.  So that's -- well, not

their problem and not our problem.

MR. HARVIS:  Right.

THE COURT:  It was on you guys.  Didn't do it

timely, so I'm sorry.

1    MR. HARVIS:  No, no, I understand.  It's just for an

2  indigent person who's not allowed to have -- to be treated on

3  a lien it becomes I think a real impediment --

4    THE COURT:  No.

5    MR. HARVIS:  -- to them.

6    THE COURT:  I didn't say that -- I said in that --

7  the psychological so maybe the PTSD, but a TBI -- well,

8  actually it was that also.

9    MR. HARVIS:  I mean, I just -- I mean, the rules

10 require supplementation and his symptoms didn't -- he

11 wasn't -- he didn't feel -- being poor he didn't feel

12 sufficiently symptomatic to go and have the further testing

13 done until the case was a little further along and within

14 the -- before -- during discovery while they've never taken

15 his IME, they've never noticed any doctor for a deposition,

16 they've never done anything, there's no prejudice at all,

17 they're getting more time.  And all I'm saying is now this

18 "more time" is almost like an abstraction because we're being

19 precluded from the things that they're investigating.  And I'm

20 just saying, let them do the investigation.  We consented to

21 it, but let's just hold off on a preclusion order and see what

22 the discovery shows and let the court in its ordinary course

23 decide whether or not preclusion is warranted instead of X

24 ante, you know, based on no prejudice where we've kind of been

25 sandbagged and I don't -- I just don't -- I -- I've said

1    enough.  So I respect Your Honor's ruling.  I just wanted the

2    opportunity to argue for reconsideration.

3           THE COURT:  Assume that I've heard Mr. Harvis and I

4    am considering whether to reconsider my ruling.  Go ahead.

5           MR. BERGMAN:  Yes, Your Honor.  So first based on

6    Your Honor's prior ruling plaintiff will be able to get any

7    continuing treatment he's had with respect to the injuries

8    that were set forth in Dr. Guy's report and I imagine in his

9    initial disclosures and interrogatory responses, which are

10    extensive.

11           But beyond that, to say that plaintiff -- for the

12    first time at the close of discovery suffered from PTSD,

13    anxiety, depression, a post-concussion syndrome that seems to

14    have no basis in fact, defendants would be prejudiced to the

15    extent plaintiff is able to start arguing that now.  The fact

16    is that there were deadlines that weren't met.

17           And in this instance for plaintiff to start saying

18    three years after the incident that he started to develop

19    psychological injuries or starting to exhibit symptoms from a

20    TBI when he actually went to an expert and was able to afford

21    that apparently, it's inconsistent and it seems to indicate at

22    a minimum that plaintiffs were trying to essentially ambush

23    defendants with all these new claims and they shouldn't be

24    permitted to do so.

25           MR. HARVIS:  Depose --

1    THE COURT:  Okay.  In your motion you asked for an

2    extension of discovery to allow you to --

3    MR. BERGMAN:  The extension request, Your Honor,

4    was --

5    THE COURT:  To get into these things, to get the

6    records, to reopen the plaintiff's deposition and a

7    corresponding extension of the expert deadlines or, in the

8    alternative, preclude them from referencing any non-garden

9    variety purported psychological or cognitive issues and any

10   corresponding treatment during the pendency of this

11   litigation, so it's either/or.

12   MR. BERGMAN:  Yes, sir.

13   THE COURT:  I gave you both.

14   MR. BERGMAN:  Which we are very appreciative, Your

15   Honor.

16   THE COURT:  All right.  That's not fair.  Okay.  So

17   you got your extension.  Your record is set.  I don't think

18   you're getting any of this stuff in, but it's up to Judge

19   Gershon to decide.  Okay.

20   MR. BERGMAN:  Your Honor, just so --

21   THE COURT:  They can -- that supplemental disclosure

22   and whatever medical records currently exist, don't send them

23   to anybody else, don't have any of those other -- it's as of

24   the date of the motion.  The record is frozen.  Whatever

25   medical records exist as to that point in time, that's all

1  they can try to get in.  If they don't have an expert or a

2  treating that can testify to whatever extent Judge Gershon

3  allows, if it's short of he has a TBI -- I diagnosed him with

4  a TBI during this treatment, it's causally related to this,

5  it's -- and that causation is relevant to how I'm treating the

6  TBI, if they don't have that as of the date of the motion in

7  the medical records, I seriously doubt that Judge Gershon is

8  going to allow them to testify about TBI, PTSD, any of that

9  stuff.

10       So what they have as of the date of the motion is

11  what they're stuck with, but you can send him -- you have your

12  extension.  You can get those records, send him to a TBI

13  specialist, a PTSD specialist, arm yourselves to counter if

14  Judge Gershon allows them to testify and then you can --

15  you'll just -- it will be battle of treatings and experts.

16            MR. BERGMAN:  Understood, Your Honor.

17            THE COURT:  All right.  Okay.  Still have to pay for

18  his time in the deposition.

19            MR. BERGMAN:  Understood.

20            THE COURT:  All right.  What else?

21            MR. HARVIS:  Nothing from plaintiffs, Your Honor.

22            MR. BERGMAN:  Your Honor, for defendant I think

23  Ms. Bates would like to make a quick statement.

24            THE COURT:  Sure.

25            MS. BATES:  Good morning, Your Honor.  I just wanted

1   to address the court's concern regarding the NYPD's production

2   of records and compliance with discovery.  I know that this

3   case and <u>Brown</u> were not the only examples of issues that the

4   Department has had and what are now called legacy cases with

5   respect to the identification and production of documents.

6         So I supervise a unit of approximately 40 uniform

7   and civilian members of service whose responsibility it is to

8   identify, collect and preserve and produce to the New York

9   City Law Department evidence in connection of civil

10   litigation.  We process between 35,000 and 40 such requests --

11   40,000 such requests for individual pieces of evidence per

12   year.

13         In that capacity dating back to 2014 we immediately

14   identified issues with respect to where documents are stored,

15   how they're stored, how they're searched for and two

16   significant policy changes will impact all cases going forward

17   before Your Honor.  One is the June 1, 2016 change in the

18   Department's use of force policy which dictates which unit

19   responds to an incident that often matured to civil litigation

20   and further dictates where records are retained in connection

21   with those investigations.

22         So in use-of-force cases going forward anything that

23   pre -- post-dates June 1, 2016 it will be very clear to the

24   New York City Law Department where to request records from and

25   whom should have conducted the investigation given the

1  parameters in any policy.

2          The second changes that as of January 1, 2018, all

3  internal investigative steps are documented in a uniform

4  electronically stored system.  So unlike in this case where

5  the Queens Warrant Investigations Unit had a paper file, and

6  IB from 26 [ph.] had an electronically stored file and Captain

7  Forgione created a memorandum, presumably on a desktop from

8  the one 110 Precinct.  All such steps are now documented in

9  one electronic system.  So any request we receive for an

10  internal investigation we'll now be able to generate an

11  electronic investigative file in a much quicker turnaround

12  than it was capable for us to do in the past.  So I

13  essentially wanted to assure, Your Honor, that your ruling in

14  these cases do not go unnoticed by the New York Police

15  Department.  We take these cases very seriously.  They have a

16  tremendous impact on our members of service and we continue to

17  keep civil litigation in mind as we develop and improve

18  systems with respect to both records retention and the quality

19  of Department investigations.

20          THE COURT:  I do appreciate that.  Thank you.  You

21  know, we don't -- I saw from my colleagues don't lightly issue

22  rulings like they did in Brown.  It's not -- certainly not

23  enjoyable.  But one of the problems that I've experienced is

24  the -- it seems like no matter what systems are put in place

25  unless the rank and file adhere to those systems it's

1  meaningless.

2       So if you're -- if the officer on the beat doesn't

3  know he's got to do X, Y and Z and get it into this system

4  it's not going to work.  And if they don't do that, if they

5  know they're supposed to do it and they don't do it and

6  they're not disciplined for that it's a complete waste of

7  time, too.

8       So the Commissioner should be ready, willing and

9  able to sanction his officers who don't comply with this --

10 these programs and systems that you're working very hard to

11 put into place.  And also the Law Department -- you know,

12 there needs to be that connection between the Law Department

13 and the NYPD, so Mr. Bergman knows where to get the

14 information from because it's his reputation on the line, too.

15 So I don't want to -- you know, I don't want to say more than

16 that but I do appreciate the fact that you have 35,000

17 uniform --

18            MS. BATES:  Seven thousand pending civil cases --

19            THE COURT:  No, I'm talking about officers.

20            MS. BATES:  We have 36,000 uniform officers who

21 service that?

22            THE COURT:  Thirty-six?

23            MS. BATES:  Thirty-six thousand uniformed --

24            THE COURT:  It's huge.  I mean, it -- it's a huge

25 bureaucracy and it's -- I know it's hard and I appreciate the

difficulty and I thank you for working hard to put a system in place.

MS. BATES: Thank you, Your Honor. And we have amplified our training capacity both with respect to the uniform members of service and we also have amplified our training and communication within the New York Law Department in furtherance of those same goals. It's our goal to have all cases decided on the merits and not be before Your Honor on these unrelated discovery matters more often than not.

THE COURT: Okay. Thank you.

MS. BATES: Thank you.

MS. FETT: And, Your Honor, if I may, Melissa Jacobs. I'm Mr. Bergman's -- I've been supervising this case and I came again just to let Your Honor know that the Law Department as well does take these things seriously and we're aware of what's been going on in this case and in Brown and are working to rectify things to the extent things do fall through the cracks.

THE COURT: Thank you. Anything else?

MR. BERGMAN: No, Your Honor, thank you.

MR. HARVIS: No, Your Honor, thank you very much.

THE COURT: Can we go off the record, please, Mary?

(Proceedings concluded at 12:10 p.m.)

* * * * * * *

1    I certify that the foregoing is a court transcript

2  from an electronic sound recording of the proceedings in the

3  above-entitled matter.

4

5

6  _____

7    Ruth Ann Hager, C.E.T.**D-641

8  Dated:  August 13, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25